T.C. Memo. 1995-464

UNITED STATES TAX COURT

LEO N. LEVITT AND RUTH G. LEVITT, Petitioners v.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 27857-90.        Filed September 28, 1995.

Herbert L. Zuckerman, Robert J. Alter, and Richard J.
Sapinski, for petitioners.

Daniel O'Brien and Patrick E. Whalen, for respondent.

TABLE OF CONTENTS

Page

FINDINGS OF FACT

A.   Petitioners............................................4
B.   Resyn Corporation......................................7
C.   Polymer Chemicals.....................................11
D.   Chemical Traders......................................13
E.   Resyn's Bankruptcy ...................................17
F.   Respondent's Investigation of Petitioner and Resyn.......18

G.  Third Party Information.................................23
H.  Meetings With FBI Agents and Strike Force Attorney.......23
I.  Referral of Case to the Justice Department..............24
J.  Petitioner's Criminal Case.............................26
K.  Resyn's Bankruptcy Trial...............................26
L.  Sale of Resyn Corporation..............................33
M.  Notice of Deficiency...................................34
N.  Petitioners' 1963 Return...............................34


OPINION

A.  Whether Respondent Violated Grand Jury Secrecy Rules.....35
B.  Whether Petitioner Is Collaterally Estopped From
    Denying Factual Findings of the Bankruptcy Court........37
C.  Whether Respondent's Determination Is Arbitrary.........45
D.  Whether Petitioners Received Constructive Dividends......47
E.  Whether Petitioner Is Liable for Fraud for 1963.........53
F.  Whether Petitioner Is Liable for Fraud for 1964 to 1970..54
G.  Statute of Limitations.................................64
H.  Whether Ruth Levitt Is an Innocent Spouse...............64

MEMORANDUM FINDINGS OF FACT AND OPINION

COLVIN, Judge:  Respondent determined that both petitioners are liable for deficiencies in income tax and that petitioner Leo Levitt is liable for additions to tax for fraud as follows:

|       |            | Addition to Tax |
| Year  | Deficiency | Sec. 6653(b)    |
|-------|------------|-----------------|
| 1963  | $180,853.16 | $90,732.96     |
| 1964  | 225,591.07  | 113,118.26     |
| 1965  | 67,160.06   | 34,407.72      |
| 1966  | 241,895.20  | 120,947.60     |
| 1967  | 98,213.03   | 49,106.52      |
| 1968  | 221,132.70  | 122,893.86     |
| 1969  | 258,763.57  | 134,598.39     |
| 1970  | 17,945.61   | 21,129.21      |

Following concessions, we must decide the following issues:

1.  Whether respondent's use of Resyn Corporation's business records violated grand jury secrecy rules.  We hold that it did not.

2. Whether petitioner Leo Levitt is collaterally estopped from contesting factual findings made by the U.S. bankruptcy court in a trial relating to respondent's tax claims against Resyn Corp., which he controlled. We hold that he is.

3. Whether respondent's determination was arbitrary. We hold that it was not.

4. Whether petitioners had unreported dividend income during the years in issue. We hold that they did.

5. Whether petitioner Leo Levitt is liable for fraud for 1963. We hold that he is not because there is no evidence of the contents of that return.

6. Whether petitioner Leo Levitt is liable for fraud for 1964 to 1970. We hold that he is.

7. Whether the statute of limitations bars assessment of tax for petitioners for 1964 to 1970. We hold that it does not.

8. Whether petitioner Ruth Levitt is an innocent spouse under section 6013(e) for any of the years in issue. We hold that she is not.

References to petitioner are to Leo Levitt. Section references are to the Internal Revenue Code in effect during the years in issue. Rule references are to the Tax Court Rules of Practice and Procedure. References to rule 6(e) are to rule 6(e) of the Federal Rules of Criminal Procedure.

Some of the facts have been stipulated and are so found.

FINDINGS OF FACT

A.   Petitioners

   1.   Generally

Petitioners were married and resided in Verona, New Jersey, when they filed their petition.

Petitioner was born in 1914.  He graduated from Dartmouth University in 1936 with a degree in chemical engineering and worked for chemical companies until 1951.  As discussed in more detail below in section B, petitioner owned and controlled the Resyn Corporation (Resyn) during the years in issue.

Ruth Levitt was born in 1918.  She graduated from high school and secretarial school.  Petitioners met in 1938 and married in 1941.  Ruth Levitt never worked outside the home. Petitioners had four daughters, born in 1943, 1946, 1952, and 1956.  Ruth Levitt took care of her ailing mother for a period of time not specified in the record.  She did not visit or know much about her husband's business.

Petitioners bought land in South Orange, New Jersey, in 1948.  Petitioners rented a dwelling until 1952 when they moved into a home they built on their South Orange land.  Ruth Levitt had sole ownership of that home.

Petitioner did not have a personal checking account.  Ruth Levitt had checking and savings accounts from 1960 to 1970.  She used those accounts for the family finances.  During the years

in issue, Ruth Levitt drove new cars and had a comfortable standard of living. Petitioners took regular vacations to Las Vegas and Florida from 1963 to 1970.

2. <u>Welev of Pinellas County, Inc.</u>

In 1959, a Brooklyn lawyer named Erwin Weiss (Weiss), who had helped organize Resyn, recommended that petitioners buy 41 acres of land in St. Petersburg, Florida. Petitioner, Ruth Levitt, Fred Berger (Berger), a St. Petersburg realtor who knew Weiss, and Weiss organized a group called Welev of Pinellas County (Welev) to hold the 41 acres. Each owned a one-fourth interest in Welev. In 1959, petitioner was president of Welev. He signed the mortgage deed. Ruth Levitt knew very little about Welev.

Weiss incorporated Welev around 1960. Welev issued 30 shares of stock when it was incorporated. The original subscribers to the stock were petitioner, Berger, Meyer Tepperman, and Weiss. Each had 7.5 shares.

In 1970, Resyn owed Hooker Chemical Co. (Hooker) about $2 million. Hooker supplied folacin hydride to Resyn. Petitioner agreed to guarantee Resyn's debt. Petitioner pledged the Welev property as collateral to Hooker.

In 1986, Welev sold its Florida property. Petitioners filed separate returns for 1986. Ruth Levitt reported on her return a

capital gain of $999,338 from the liquidation of Welev stock, which she reported that she acquired in 1964.

   3.   Petitioners' Income Tax Returns

Petitioners filed joint income tax returns for 1963 to 1970. Harry Levenson (Levenson) prepared petitioners' income tax returns for 1964, 1965, and 1966.  He was an accountant.  His office was at 152 Clinton Avenue in Newark, New Jersey.  He later moved to 441 Springfield Avenue in Newark.  Levenson previously served as a revenue agent for the Internal Revenue Service (IRS). Levenson's wife was Ruth Levitt's cousin.

Howard Goldstein (Goldstein) prepared petitioners' returns for 1967, 1968, 1969, and 1970.  Goldstein was an accountant.  He practiced at the certified public accounting firm of I. George Goldstein & Co. (Goldstein & Co.).  I. George Goldstein was Goldstein's father.  Petitioner gave Levenson and Goldstein information to prepare his returns, including Forms 1099, Forms W-2, and brokerage account statements.

Petitioners reported wages from Resyn of $35,000 per year for 1964 and 1965, $50,000 for 1966, 1967, 1968, and 1969, and $47,960 for 1970.  They reported withholding on those wages of $10,000 per year in 1964 and 1965, $13,282.97 in 1966, $12,876 in 1967, $14,000 in 1968, $16,000 in 1969, and $11,887.85 in 1970. Petitioners did not report as income any of the amounts Resyn

paid for their benefit.  See section B-3, below.  Petitioners reported $27,300 in miscellaneous income for 1970.

B.   Resyn Corporation

1.    Formation of Resyn Corporation

Petitioner and about 11 other people formed a chemical company called Resyn in 1951.  Resyn was incorporated in 1953. Its principal offices were in Linden, New Jersey.  Petitioner bought the stock of the other Resyn shareholders around 1956 for the amount of their original investment in the company. Petitioner controlled Resyn's operations during the years in issue.

2.    Resyn Corporation's Operations

Resyn bought, manufactured, and sold resins and other chemicals and oils used to manufacture paint.  In the late 1950's, Resyn began to produce a chemical resin used by the Ford Motor Co. in automobile paint.  Resyn made Mobil 1 for the Mobil Oil Co.  Resyn was the fourth company in the United States to manufacture epoxy.

Atlas Paint and Varnish Co. (Atlas) was one of Resyn's larger customers from 1963 to 1970.  Meyer and Harry Tepperman (the Tepperman brothers) owned Atlas.  Atlas manufactured paint. Atlas bought large amounts of alkyds from Resyn to make paint.

3.  Resyn's Payments for Petitioners' Personal Benefit

Resyn paid for many of petitioners' personal expenses and personal stock investments.[1] He had Resyn pay Ruth Levitt a weekly allowance of about $350. Ruth Levitt received Resyn checks paid to cash totaling $25,737 in 1967, $24,930 in 1968, and $25,761 in 1969. She used those funds to pay household expenses. Petitioner had Resyn pay the mortgage on their home. Resyn paid $3,477.42 for 1967, $4,463.67 for 1968, and $4,081.35 for 1969 for the mortgage on petitioners' home.

Petitioner had Resyn pay for many of Ruth Levitt's shopping expenses. In 1967, 1968, and 1969, Resyn also paid for Ruth Levitt's purchases at Bloomingdale's, Saks Fifth Avenue, Fellers, Lord & Taylor, and many other stores.

Resyn paid Evelyn Mejia, a nurse for petitioners' children, and William Morrison, a handyman and chauffeur at petitioners' home. Resyn paid landscaping and gardening expenses at petitioners' home. Resyn paid petitioners' children's expenses to attend Prospect Hill Country Day School, Newark Academy, and Kenwood Camp for Girls from 1967 to 1969. From 1967 to 1969, Resyn paid Berkeley School and MacBrian Educational Consultants, Inc. Petitioners deducted $500 for 1967 and $100 for 1968 on their income tax returns for charitable gifts to Camp Deal for

----

[1] Resyn business records are missing except for parts of 1967, 1968, and 1969. There is no evidence that Resyn's arrangements to pay petitioners' expenses were different from 1963 to 1966, or in 1970.

boys.  Resyn wrote checks to Camp Deal for Boys for $500 in 1967 and $100 in 1968.

Resyn paid Weiss and the Tax Collector, Sarasota, Florida, for petitioners' purchase of Welev's land and Welev stock from 1963 to 1970.

Petitioner had Resyn pay some of his expenses for dry cleaning, medications from his pharmacy, and individual income taxes in 1967, 1968, and 1969.  Resyn paid petitioners' personal expenses of about $261,789 in 1967, $431,592 in 1968, and $341,725 in 1969, for a total of $1,035,106 during those years.

4.  Resyn's Bookkeeping and Tax Returns

Resyn maintained double entry books and records.  Ann Hall (Hall) was Resyn's first bookkeeper.  Hall usually prepared the deposit tickets.  As Resyn grew, Resyn hired Vera Philbin (Philbin) and others to help Hall.  Philbin entered payables in Resyn's purchases journal and made journal entries in the general ledger.  Goldstein & Co. prepared the journals she used. Petitioner was not involved in Resyn's bookkeeping.

Resyn filed income tax returns for 1963 to 1970.  Levenson was Resyn's accountant and return preparer and an employee of Resyn from Resyn's inception to 1965 or 1966.  Goldstein & Co. also performed accounting services for Resyn.  Until 1965, Goldstein & Co. compiled information for the Resyn tax return and gave it to Levenson to prepare the return.  Goldstein approved those returns for Goldstein & Co.

Resyn gradually reduced Levenson's function to checking postings in the purchases journal by Resyn's bookkeepers. Levenson worked about 1 day per week.

Goldstein & Co. prepared Resyn's returns for 1966 to 1969. Goldstein began to supervise the Resyn account for Goldstein & Co. in 1965 or 1966. Goldstein spent 5 to 10 days per year at Resyn closing the books and preparing the corporate tax return. Resyn's bookkeepers gave Goldstein access to Resyn's books and records. Goldstein did not verify sales or check inventory because he believed Resyn's staff handled those items correctly.

At the end of 1967, 1968, and 1969, Goldstein classified the checks Resyn paid for the personal benefit of petitioners as loans made by Resyn to petitioner. Goldstein increased petitioner's loan account by $69,815.09 in 1967, $214,376.58 in 1968, and $189,350.46 in 1969, and decreased it by $200,000 in 1968. The decrease did not occur because petitioner repaid Resyn. Molly Goldstein, Goldstein's mother, lent $200,000 to Resyn in 1967. Resyn paid interest on the loan to Goldstein's mother from 1967 to 1970. Resyn paid $30,000 of interest to Goldstein's mother after 1968. In 1968, Goldstein transferred the account payable from Resyn to petitioner and decreased petitioner's loan account by $200,000. At trial, Goldstein conceded that he had no authority to do this and that it was not an appropriate accounting practice to decrease petitioner's loan account by $200,000 in 1968. Goldstein's mother filed a claim in

the Resyn bankruptcy for $200,000 after 1970.  She later received 37-1/2 cents per dollar of claim.  Petitioner had not repaid Resyn by the time of the bankruptcy trial in 1981.

Resyn did not report paying any dividends from 1963 to 1970.

C.  Polymer Chemicals

1.  Formation of Polymer Chemicals

Petitioner suggested that he and Levenson form a partnership called Polymer Chemicals (Polymer).  On September 17, 1954, Levenson registered the trade name Polymer Chemicals with the State of New Jersey under his name alone.  The trade name certificate stated that Polymer's address was 152 Clinton Avenue, Newark, New Jersey, which was Levenson's office.  Polymer  never did business at that address.  Polymer had a checking account at the National State Bank, Hillside, New Jersey, from 1963 to 1970.  Although Levenson was authorized to sign checks on the Polymer account, petitioner directed him to sign and endorse blank Polymer checks.  Levenson never saw the proceeds from these checks.

The monthly bank statements did not include a mailing address for Polymer.  Petitioner went to the bank to get Polymer's bank statements and canceled checks.  Polymer did not file Federal income tax returns.

2.  Polymer Transactions

Unlike other Resyn transactions the Polymer purchase invoices did not include any bills of lading.  Resyn's checks to

Polymer were for fictitious purchases.  Petitioner controlled the Polymer account.  Petitioner diverted the following amounts from Resyn to the Polymer checking account:

| Year | Amount of Deposits | Monthly Statements Available |
|------|--------------------|------------------------------|
| 1963 | $108.404.48 | 5 |
| 1964 | 238,555.24 | 11 |
| 1966 | 87,750.12 | 1 |
| 1967 | 40,517.47 | 12 |
| 1969 | 122,649.81 | 12 |
| 1970 | 5,370.72 | 12 |
| Total | 603,247.84 | |

In 1963, petitioner deposited in the Polymer account Resyn checks payable to T.F. McAdam (not otherwise identified in the record) dated July 2, 1963, for $11,798.81 and July 8, 1963, for $11,785.89.

There were often long delays in negotiating the Resyn checks deposited in the Polymer account.  Resyn checks totaling $87,750.12, which petitioner deposited in the Polymer account in 1966, were written in 1963.  In 1968, petitioner deposited in the Polymer account $10,000 of Resyn checks written in 1967.  In 1969, petitioner deposited in the Polymer account a Resyn check for $517.83 written in 1967 and Resyn checks totaling $56,564.76 written in 1968.

Petitioner had Levenson sign and endorse blank checks on the Polymer account which petitioner later wrote to cash as follows:

| Date of Check | Amount |
|---------------|--------|
| Jan. 15, 1968 | $10,000 |
| Sep. 25, 1968 | 22,000 |
| Nov. 29, 1968 | 8,000 |

| | |
|---|---|
| Mar. 17, 1969 | 13,000 |
| Apr. 18, 1969 | 5,500 |
| May  21, 1969 | 12,000 |
| Jun. 20, 1969 | 8,000 |
| Jul. 25, 1969 | 13,000 |
| Sep. 19, 1969 | 5,000 |
| Sep. 30, 1969 | 15,000 |
| Oct.  8, 1969 | 10,000 |
| Oct. 23, 1969 | 5,000 |
| Oct. 31, 1969 | 5,000 |
| Nov. 14, 1969 | 6,000 |
| Nov. 29, 1969 | 5,000 |
| Dec. 22, 1969 | 5,000 |

The checks were negotiated in the year written.

D.   Chemical Traders

1.   Petitioner's Formation and Use of Chemical Traders

On May 31, 1955, petitioner and his brother, Jesse Levitt, registered the trade name Chemical Traders with the State of New Jersey.  The trade name certificate stated that Chemical Traders would do business at 128 Clinton Avenue, Newark, New Jersey. Petitioner opened a Chemical Traders bank account on November 20, 1959.  Chemical Traders had a checking account at the National State Bank, Hillside, New Jersey, from 1963 to 1970.  Petitioner signed the signature card for the account and personally conducted Chemical Traders' transactions at the National State Bank.  Chemical Traders monthly bank statements did not have a mailing address.  Petitioner picked up the Chemical Traders' monthly bank statements and canceled checks.  Philbin, Levenson, and Goldstein did not know about Chemical Traders or the Chemical Traders bank account at the National State Bank during the years in issue.

There was no Chemical Traders office or plant at 128 Clinton Avenue, Newark, New Jersey, when respondent's agents investigated this case in 1971 and 1972. Respondent's agents did not find any reference to Chemical Traders in a directory of chemical suppliers.

Petitioner required Resyn's buyers to deliver their payments to Chemical Traders to his home. The checks from one buyer totaled as follows:

| Year | Amount of Checks | Year | Amount of Checks |
|------|------------------|------|------------------|
| 1963 | $24,276.40 | 1967 | $38,254.00 |
| 1964 | 59,042.36 | 1968 | - 0 - |
| 1965 | 18,015.00 | 1969 | 2,766.35 |
| 1966 | 199,037.00 | 1970 | 15,600.00 |

Petitioner either cashed these checks or deposited them in the Chemical Traders bank account.

Chemical Traders did not file income tax returns for the years 1963 to 1970.

2. Amounts Petitioner Diverted From Resyn to Chemical Traders

Petitioner diverted the following amounts from Resyn to the Chemical Traders' checking account:

| Year | Amount of Deposits | Monthly Statements Available |
|------|--------------------|------------------------------|
| 1963 | $163,497.44 | 6 |
| 1964 | 297,115.19 | 11 |
| 1965 | 248,435.81 | 12 |
| 1966 | 526,815.33 | 12 |
| 1967 | 253,767.62 | 12 |
| 1968 | 66,554.58 | 12 |
| 1969 | 70,878.23 | 11 |
| 1970 | 15,600.00 | 11 |
| Total | $1,642,664.20 | |

3.    Rambach Chemical Corp.

Rambach Chemical Corp. (Rambach) did business with Resyn beginning in 1952.  From 1963 to 1967, Rambach paid Chemical Traders' bills for chemicals Resyn supplied to Rambach as follows:

| Year | Amount |
|------|--------|
| 1963 | $10,275.00 |
| 1964 | 63,043.36 |
| 1965 | 18,015.00 |
| 1966 | 126,870.00 |
| 1967 | 6,480.00 |
| 1969 | 14,425.00 |
| 1970 | 15,900.00 |

Petitioner told Rambach to mail payments for chemicals to his home.  Harvey Rambach, president of Rambach, sent a letter to Leo Levitt, Chemical Traders, 128 Clinton Avenue, Newark, New Jersey, on March 10, 1969.  The Post Office returned the letter undelivered, "Addressee Unknown".  Chemical Traders did not have any production facilities when it dealt with Rambach.

4.    MacArthur Petroleum & Solvent Co.

From 1966 to 1969, MacArthur Petroleum & Solvent Co. (MacArthur) paid Chemical Traders for commissions and discounts on sales from Resyn to MacArthur.  Under the agreement between Sande Wische, president of MacArthur, and petitioner on behalf of Resyn, MacArthur billed Resyn full price for chemicals that Resyn bought, and MacArthur paid Chemical Traders separately for any commissions and discounts it owed to Resyn.  Petitioner deposited the checks from MacArthur for Resyn's discounts and commissions

in the Chemical Traders account.  MacArthur paid the following

Resyn discounts and commissions to Chemical Traders:

| Date | Amount |
|------|--------|
| Nov. 15, 1966 | $2,272.49 |
| Dec. 20, 1966 | 2,200.84 |
| Feb. 18, 1967 | 1,963.97 |
| Apr. 17, 1967 | 1,853.45 |
| Apr. 17, 1967 | 1,770.47 |
| Jun. 28, 1967 | 1,578.98 |
| Sep. 22, 1967 | 5,298.71 |
| Jan. 26, 1968 | 5,427.29 |
| Mar.  8, 1968 | 6,120.16 |
| Jul. 15, 1968 | 3,399.72 |
| Jul. 15, 1968 | 2,771.75 |
| Jul. 31, 1968 | 2,673.42 |
| Sep. 13, 1968 | 5,006.10 |
| Nov.  8, 1968 | 3,708.10 |
| Dec. 10, 1968 | 4,222.20 |
| May  23, 1969 | 8,373.73 |
| Oct. 24, 1969 | 8,296.35 |

5.   Spencer-Kellogg and Atlas Paint

Resyn bought linseed oil from Spencer-Kellogg Co. (Spencer-Kellogg) in 1967 and 1968.  Resyn paid Spencer-Kellogg for the oil.  Spencer shipped the oil to Atlas.  Chemical Traders billed and was paid by Atlas for the linseed oil.  As a result, Resyn paid for the linseed oil but did not receive it, and Chemical Traders sold it to Atlas without paying for it.

6.   Petitioner's Use of Funds in the Chemical Traders Account

Petitioner wrote checks to cash from the Chemical Traders account totaling:  $160,824 in 1965, $160,541 in 1966, $256,000 in 1967, $69,500 in 1968, $53,850 in 1969, and $19,500 in 1970. He endorsed all but two of those checks (dated June 28, 1965, for $1,625; and June 1, 1967, for $1,000).  The camp attended by

petitioners' children in 1965 endorsed the 1965 check.  A close friend of petitioner endorsed the 1967 check.

Petitioner used the Chemical Traders checking account to buy the following cashier's checks that he used to buy stock:

| Year | Amount of Checks | Payee |
|------|------------------|-------|
| 1963 | $30,000 | Leo N. Levitt |
| 1963 | 28,000 | Heller & Meyer |
| 1964 | 22,500 | Leo N. Levitt |
| 1964 | 61,000 | Heller & Meyer |
| 1965 | 20,625 | Heller & Meyer |
| 1966 | 23,300 | Carl M. Loeb Rhodes & Co. |
| 1966 | 26,690 | Bache & Co. |
| 1966 | 15,000 | Edwards & Hanley |
| 1966 | 88,445 | Heller & Meyer |
| 1967 | 30,000 | Leo N. Levitt |
| 1967 | 16,000 | Eastman Dillon |
| 1967 | 2,000 | Edwards & Hanley |
| 1967 | 78,500 | Bache & Co. |
| 1968 | 2,007 | Eastman Dillon |
| 1969 | 3,950 | Pressman, Frohlich & Frost |
| 1969 | 4,400 | Heller & Meyer |
| Total | $452,417 | |

E.   Resyn's Bankruptcy

On September 3, 1970, Resyn filed a petition for chapter 11 reorganization with the U.S. bankruptcy court for the District of New Jersey.

The bankruptcy court appointed a receiver to operate Resyn during the bankruptcy proceedings.  The receiver unsuccessfully tried to obtain Resyn's books and records for the years in issue.

In December 1970, petitioner filed a Statement of Affairs with the bankruptcy court on behalf of Resyn, in which he answered certain questions.  Question 7 was as follows:

> Bank accounts and safe deposit boxes
>
> a.    What bank accounts have you maintained, alone or together with any other person and in your name or any other name, within the two years immediately preceding the filing of the original petition herein?
>
> (Give the name and address of each bank, the name in which the deposit was maintained and the name of every person authorized to make withdrawals from such account.)

Petitioner answered question 7, but did not mention the Chemical Traders or Polymer accounts.

The Commissioner filed a proof of claim on January 5, 1971, and several amended proofs of claim between January 27, 1971, and September 19, 1976.  The Commissioner filed a final amended claim of $2,376,726.43 for unpaid corporate income taxes, interest, and penalties for 1963 to 1970.

F.    Respondent's Investigation of Petitioner and Resyn

1.    Administrative Investigation

Respondent began a joint criminal and civil administrative investigation of petitioner and Resyn in December 1970.  An administrative investigation is an investigation that is conducted solely by respondent's agents.  It is not conducted before a grand jury.  A special agent and cooperating revenue agents were assigned to the investigation.

A U.S. attorney, respondent's agents, and persons outside the IRS sometimes help a grand jury to investigate a case. Respondent did not participate in a grand jury investigation of Resyn or petitioner.

2. <u>Strike Force</u>

Respondent's administrative investigation of petitioner and Resyn was part of a program to investigate persons suspected of being involved with organized crime. The program was later called a strike force. The strike force included the Federal Bureau of Investigation (FBI), Secret Service, Bureau of Narcotics and Dangerous Drugs, Bureau of Alcohol, Tobacco, & Firearms, Customs Service, Postal Service, and IRS. The IRS and other agencies made progress reports to strike force attorneys.

Respondent's agents, and not strike force personnel, controlled the joint civil and criminal tax investigation of Resyn and petitioner. Strike force attorneys helped agents of different agencies conduct their investigations if needed. Respondent's investigators in this case filed periodic status reports with the strike force coordinator, Arthur Rubenstein (Rubenstein), who forwarded them to the Regional Organized Crime Drive Coordinator who monitored strike force cases. The regional coordinator forwarded the reports to respondent's Intelligence Division at the national office in Washington, D.C. Those status reports did not go to the U.S. Attorney's Office or to any strike force attorney.

3.   Early Stages of the Investigation

Special Agent Erich Fried (Fried) was the first agent assigned to the investigation.  Revenue Agent Richard Cronin (Cronin) was assigned to the investigation as the cooperating agent.  He worked with Fried.  Irving B. Dubow (Dubow) supervised the investigation.  Above Dubow in the chain of command were a branch chief, an assistant division chief, and the Chief, Intelligence Division in Washington, D.C.  Dubow's agents believed that Ruth Levitt was related to an organized crime racketeer.

Fried started the file on this case when he received a newspaper clipping stating that the Union County prosecutor's office had obtained an indictment of petitioner for chemical theft.  Fried immediately began trying to get Resyn's books and records.  Fried, Cronin, and Dubow wanted to calculate Resyn's tax liability so the Commissioner could file a proof of claim in the Resyn bankruptcy proceeding.  Fried and Cronin tried unsuccessfully to obtain Resyn's records from the bankruptcy trustee and receiver.  At that time, Fried and Dubow did not use the administrative summons procedure under section 7602 because they believed it took too long to enforce.

4.   Reluctant Witness Procedure

During the years respondent investigated this case, respondent sometimes used the "reluctant witness" procedure to obtain evidence.  Under this procedure, a special agent could request IRS and Justice Department approval to subpoena a witness

to appear before a grand jury.  Respondent's reluctant witness

procedure at that time required the agent to show that the

investigation was stymied and to provide a summary of the

witness' anticipated testimony.  If the IRS and the Justice

Department approved the request, Justice Department attorneys

could use grand jury subpoenas to obtain evidence and could seek

a rule 6(e)[2] order from a Federal District Court permitting them

to give that evidence to the IRS.

Around March 1971, Fried asked his supervisors for grand

jury assistance in this case.  He sent (via his supervisor) a

memorandum to the Chief, Intelligence Division, asking for

permission to issue a grand jury subpoena to petitioner to compel

---

[2] Rule 6(e) provides:

    (e)  Secrecy of Proceedings and Disclosure.
Disclosure of matters occurring before the grand jury
other than its deliberations and the vote of any juror
may be made to the attorneys for the government for use
in the performance of their duties.  Otherwise a juror,
attorney, interpreter, stenographer, operator of a
recording device, or any typist who transcribes
recorded testimony may disclose matters occurring
before the grand jury only when so directed by the
court preliminarily to or in connection with a judicial
proceeding or when permitted by the court at the
request of the defendant upon a showing that grounds
may exist for a motion to dismiss the indictment
because of matters occurring before the grand jury.  No
obligation of secrecy may be imposed upon any person
except in accordance with this rule.  The court may
direct that an indictment shall be kept secret until
the defendant is in custody or has given bail, and in
that event the clerk shall seal the indictment and no
person shall disclose the finding of the indictment
except when necessary for the issuance and execution of
a warrant or summons.

him to provide Resyn's records.  He explained that Resyn's receiver in bankruptcy had been unable to get Resyn's records.  Fried sent the memorandum because he wanted to review Resyn's books and records and because the cooperating revenue agent needed those records to prepare a proof of claim.  Fried's request was approved.  Fried served grand jury subpoenas on petitioner and Goldstein on June 17, 1971, and Philbin on June 28, 1971.  Philbin, Resyn's bookkeeper, gave Resyn's business records to the grand jury.  Respondent obtained those records from the grand jury.

In July 1971, Special Agent Frank O'Byrne (O'Byrne) replaced Fried in the investigation of petitioner and Resyn.  O'Byrne read the case file when he was assigned to the case.  It contained certain of Resyn's ledgers, files, and canceled checks for 1967, 1968, and 1969.  The file also contained transcripts of the grand jury testimony of Goldstein, Becker, and Philbin.  The file did not include a copy of a rule 6(e) order.

Revenue Agents Paul A. Dorgeval, Jr. (Dorgeval), and Cronin continued to investigate petitioner and Resyn for respondent.  Dorgeval and Cronin did not read the grand jury transcripts.

From July to October 1971, respondent's agents examined Resyn's canceled checks.  They discovered a wide gap between the time that certain Resyn checks were written and the time they were deposited or negotiated by the payee.

G.   Third Party Information

Respondent's agents suspected that Resyn had made payments to fictitious entities.  Based on that theory, Cronin, Dorgeval, and O'Byrne issued 48 administrative summonses from November 3, 1971, to September 26, 1972.  They issued administrative summonses to third parties including banks, businesses that bought and sold Resyn products, and Goldstein, who prepared petitioners' tax returns.  In the summons, they asked for bank records, canceled checks, invoices, and other business records pertaining to Resyn, Chemical Traders, Polymer, and petitioners.

Respondent's agents discovered the Chemical Traders account between July 1971 and December 1972.

Respondent's agents could not reconstruct all of Resyn's transactions because most of Resyn's business records for the years in issue were missing.  Respondent's agents had only Resyn's general ledger and journal for 1969, purchase journals for 1968 and 1969, and canceled checks for 1967, 1968, and 1969.

H.   Meetings With FBI Agents and Strike Force Attorney

Rubenstein was an IRS employee who was the IRS liaison with other strike force law enforcement agencies.  He also reviewed strike force reports from other agencies for possible Internal Revenue Code violations.  Cronin told the FBI that he suspected that petitioner and Resyn might have violated bankruptcy laws.  Rubenstein arranged for Cronin to meet with two FBI agents from the Newark Bankruptcy Fraud Squad.  The FBI did not investigate

petitioner or Resyn for bankruptcy fraud, and respondent took no further action.

Rubenstein arranged a meeting with representatives of the Justice Department to decide whether to grant immunity to Goldstein. Herbert Posner (Posner), a strike force attorney from the Justice Department, attended the meeting. Goldstein did not receive immunity. O'Byrne discussed this case with Posner several other times and had several other incidental contacts with Posner.

I.   Referral of Case to the Justice Department

O'Byrne completed his investigation in December 1972. In his special agent's report, filed December 29, 1972, he discussed Fried's participation in the case. He stated that grand jury subpoenas had been served. O'Byrne attached copies of the grand jury transcripts to his report. O'Byrne never saw a copy of a rule 6(e) order in this case and did not include one in his report. Dubow's group told the strike force attorney the results of the investigation after it was completed.

W.J. McElroy, a member of the Intelligence Division, Newark District, signed the following cover letter sending O'Byrne's report to the Regional Counsel's office in Philadelphia around December 29, 1972:  "The Strike Force Attorney Newark, New Jersey was advised of this investigation, the evidence obtained, and the method of proving the unreported income, and has concurred in the recommendation to prosecute".

James MacDonald (MacDonald) was a staff attorney who reviewed criminal tax matters for respondent's Regional Counsel in Newark. His work was limited to criminal enforcement. MacDonald did not have authority to stop a recommendation to prosecute a strike force case. MacDonald reviewed O'Byrne's report and the file for respondent's Regional Counsel. MacDonald had a conference with Herbert Zuckerman (Zuckerman), petitioner's counsel. In March or April 1973, MacDonald contacted O'Byrne and asked him for additional information including a copy of the rule 6(e) order. O'Byrne did not obtain a copy of the rule 6(e) order; he believed that his supervisor, Dubow, gave the rule 6(e) order to MacDonald.

MacDonald sent a criminal referral letter to Scott P. Crampton, Assistant Attorney General, Tax Division, Department of Justice, dated May 17, 1973. The letter stated:

> The specific items of unreported income in this case were discovered by review of Resyn Corporation's cancelled checks gotten by the government as a result of a grand jury subpoena (Special Agent's Report, Pages 12 and 13). The examining agents (acting pursuant to the authority granted by the Court in a valid [Rule § 6(e)] order * * *) found checks payable to Polymer Chemicals. Subsequent inquiries with the bank where the Polymer Chemical account was held disclosed the existence of the Chemical Trader account (Special Agent's Report, Page 12). No evidence of the two bank accounts was disclosed by Levitt, or by any of his employees, pursuant to testimony in bankruptcy proceedings.

MacDonald's criminal referral letter stated that a copy of the rule 6(e) order was attached as exhibit C. However, there is no copy of the rule 6(e) order in respondent's file.

Posner obtained a blanket rule 6(e) order which he believed allowed him to give any information, books, or records to any Federal law enforcement officer.  He did not get a rule 6(e) order for each investigation.  Instead, he got one that covered all investigations of a grand jury which was usually good for about a year and a half.

On April 4, 1974, O'Byrne testified before the grand jury that indicted petitioner under section 7201 for willful tax evasion for 1967 to 1969.

J.   Petitioner's Criminal Case

In 1974, petitioner pleaded nolo contendere to tax evasion for 1970 and received a suspended sentence.

K.   Resyn's Bankruptcy Trial

In January 1978, Resyn asked the bankruptcy court to expunge, reduce, or modify the Commissioner's corporate tax claim for 1963 to 1967 and fraud penalties for 1963 to 1969.  The bankruptcy court held a 6-day trial in February and March 1981, during which the parties vigorously contested Resyn's tax liability.  Zuckerman, one of petitioners' attorneys in the instant case, was Resyn's attorney at the trial.  Zuckerman saw no conflict in representing petitioner and Resyn in the bankruptcy case.  Petitioner attended the Resyn bankruptcy trial but did not testify.

The bankruptcy court issued its opinion on November 18, 1981.  That court decided that petitioner diverted Resyn income

into bank accounts of fictitious entities, resulting in substantial tax deficiencies for Resyn and that the deficiencies were due to fraud.  In re Resyn Corp. 81-2 USTC par. 9808 (Bankr. D.N.J. 1981).  The bankruptcy court found the following facts:

> Resyn understated its corporate income by diverting to Chemical Traders receipts of sales of goods owned by Resyn but never entered on the Resyn books and records as Resyn sales.

> As noted earlier, "Chemical Traders" was a trade name controlled by Leo Levitt, but the record before the Court discloses no evidence that any business entity using that name was ever located at 128 Clinton Avenue, Newark, New Jersey, the listed business address of same.  There is no evidence that Chemical Traders had any employees, any business records, or books of account, conducted any business, filed any state or federal tax returns or paid any federal or state income taxes.  The only evidence of its existence was the bank account maintained in that name at the National State Bank of Elizabeth, New Jersey.  It is noted that neither the Resyn bookkeeper, its accountant, and its comptroller had ever heard of Chemical Traders until the commencement of the Chapter XI proceedings in 1970.

> However, despite the fact that it conducted no business operation, large sums of money were deposited into the Chemical Traders' bank account.  The amount of the deposits during the years in question is as follows:

> | Year | Amount Deposited | Year | Amounted Deposited |
> | --- | --- | --- | --- |
> | 1963 | $163,497.44 | 1967 | $253,767.62 |
> | 1964 | 297,115.00 | 1968 | 66,555.58 |
> | 1965 | 248,437.13 | 1969 | 70,878.23 |
> | 1966 | 526,815.53 | 1970 | 15,600.00 |

> Many of the deposits in the Chemical Traders' bank account resulted from transactions involving Rambach Chemical Company or Rambach International Company. During the years 1963 through 1970, the Rambach companies purchased substantial amounts of chemicals which belonged to Resyn but were shipped to Rambach on invoices labeled Chemical Traders.

Deliveries of the chemicals sold to the Rambach companies originated at the Resyn plant. An invoice from the American Warehousing Corp., 96 Pine Street, Jersey City, New Jersey to Rambach charges Rambach as follows: "Chg 2nd attempt to pick up bags at Resyn Corp. $50.00." A handwritten note on this invoice reads: "Deduct from last Chemical Traders' bill we get in about 2 or 3 weeks." Thereafter Rambach took a deduction of $50.00 from the Chemical Traders' invoice dated December 8, 1966.

An invoice of the American Warehouse Corp. dated March 4, 1969 for the delivery of 2,200 bags of maleic anhydride to Rambach reads:

"Ex:   Resyn Corp.
2/24        Delayed at Resyn 1/2 day $50.00
2/28        Delayed 2 trailers at Resyn, full day
            $100.00"

With regard to this charge, Rambach wrote to Levitt at Chemical Traders, 128 Clinton Avenue, Newark, New Jersey. The latter was [returned] to Rambach stamped "Addressee Unknown."

All of the payments made by Rambach for chemicals purchased were mailed to Leo Levitt's home at 58 Whiteoak Drive, South Orange, New Jersey. This was done at the direction of Leo Levitt who caused to be attached to the Chemical Traders' invoices directions that payments were to be mailed to him at the South Orange, New Jersey address.

The checks issued by Rambach to Chemical Traders and mailed to Levitt totalled as follows:

| Year | Amount of Check | Year | Amount of Check |
|------|-----------------|------|-----------------|
| 1963 | $14,276.40 | 1967 | $38,244.00 |
| 1964 | 59,042.36 | 1968 | 0 |
| 1965 | 18,015.00 | 1969 | 2,766.35 |
| 1966 | 199,037.00 | 1970 | 15,600.00 |

The checks received by Leo Levitt for the chemicals sold to Rambach were either cashed or deposited in the Chemical Traders' bank account. Many of the Rambach checks to Chemical Traders bear the notation "for deposit only, Chemical Traders."

The chemicals sold to Rambach were the property of Resyn and the receipts from the sale of same were

diverted from Resyn to the Chemical Traders' bank account which was under the sole control of Leo Levitt. The said receipts were not entered as income on the books of Resyn and not reported on Resyn's income tax return.

The Chemical Traders' bank account was also used in certain transactions involving the Witco Chemical Company. During the course of the operation of its business, Resyn would purchase chemicals from the Witco Chemical Company and would be allowed discounts on bulk purchases made. The discounts received were then deposited not in the Resyn bank accounts but in the Chemical Traders' bank account. The total amount of deposits into the Chemical Traders' bank account which resulted from bulk purchase discounts were as follows:

|  | Deposits Resulting from |
|---|---|
| Year | Bulk Purchase Discounts |
| 1963 | $ 3,600.00 |
| 1965 | 92,588.80 |
| 1966 | 37,240.00 |
| Total | $133,428.80 |

This diversion of the bulk purchase discounts resulted in the overstatement of the cost of goods sold and the understatement of income and income tax due on the Resyn tax returns for 1963, 1965 and 1966.

Another graphic example of the diversion of income from Resyn to Chemical Traders is found in the transactions involving Spencer-Kellogg. Resyn would purchase oil from Spencer-Kellogg and upon resale of same, the bill or invoice was sent to Chemical Traders and not Resyn.

On June 19, 1967 Spencer-Kellogg shipped 31,000 pounds of raw linseed oil to the Atlas Paint Company. The Spencer-Kellogg invoice indicates that this shipment was sold to Resyn. However, it is a Chemical Traders' invoice dated, June 19, 1967, that bills Atlas for 31,020 pounds of linseed oil.

Similarly, a Spencer-Kellogg invoice charges Resyn for 4,000 pounds of 2-2 linseed oil which was sold to Resyn but shipped to the Atlas Paint Company on September 1, 1967. Resyn paid for this shipment by Check No. 6135 but Atlas Paint Company was billed not by Resyn, but, by Chemical Traders on a Chemical Traders' invoice dated, inter alia, September 1, 1967.

Thereafter on October 4, 1967, Spencer-Kellogg shipped 31,010 pounds of raw linseed oil to Atlas Paint Company and billed Resyn $4,080.92 for this shipment. Again, a Chemical Traders' invoice dated, inter alia, October 4, 1967 bills Atlas Paint Company for 31,010 pounds of raw linseed oil.

In addition to understating income through the use of the Chemical Traders' trade name, Resyn overstated the cost of goods sold by the use of the Polymer Chemicals' trade name.

As noted above, Polymer Chemicals maintained a bank account at the National State Bank of Elizabeth, New Jersey where the authorized signatory on the account was Harry Levinson.

The record fails to disclose that Polymer Chemicals maintained offices, engaged in any business venture, had any employees, was incorporated as a company in New Jersey, paid any New Jersey state corporate taxes or any federal corporate taxes or filed any such tax returns.

Irving Becker, employed by Resyn since 1967 as an expediter of deliveries to Resyn customers and as credit manager, was familiar with all of Resyn's suppliers. He testified that he was not familiar with Polymer Chemicals and knew nothing of the Polymer Chemicals' account. A world-wide survey of companies which deal in the chemicals purportedly sold by Polymer Chemicals to Resyn showed that none of them had any knowledge of a company called Polymer Chemicals. There is not a scintilla of evidence in the record indicating that Polymer Chemicals could or did deliver the large quantities of chemicals to Resyn for which it received payment from Resyn. In fact, the bookkeeper for Resyn testified that when she prepared a bill for payment, she would ordinarily receive an invoice and shipping documents but that when she received a Polymer Chemicals' invoice for payment, it was never accompanied by shipping documents.

From 1963 through 1970, numerous checks totaling $603,458.84, were drawn on the Resyn bank account payable to the order of Polymer Chemicals. The Resyn checks were signed by Leo Levitt and were deposited in the Polymer Chemicals' bank account. The breakdown of the checks deposited is as follows:

| Year | Checks Deposited |
|------|------------------|
| 1963 | $108,404.48 |
| 1964 | 238,555.24 |
| 1966 | 87,750.12 |
| 1968 | 40,818.47 |
| 1969 | 122,559.81 |
| 1970 | 5,370.72 |
| Total | $603,458.84 |

Between 1963 through 1970 Resyn paid various Polymer Chemicals' invoices for fictitious purchases of chemicals and listed said payments on the books of Resyn as costs of goods sold. As a result, Resyn's cost of goods sold was overstated in the following manner:

| Year | Amount of Overstatement |
|------|-------------------------|
| 1963 | 196,154.00 |
| 1964 | 238,555.00 |
| 1967 | 10,517.83 |
| 1968 | 87,082.23 |
| 1969 | 69,518.99 |
| 1970 | 3,420.51 |
| Total | $605,248.56 |

Many of the Resyn checks made payable to Polymer Chemicals were not deposited but were withheld for deposit for a year other than the one in which they were written. However, the adjustment to the cost of goods sold is effective for the tax year in which the checks to Polymer Chemicals were written and not the tax year in which they were negotiated.

During the same time period, 1963 through 1970, Leo Levitt withdrew a total of $1,006,019.91 from the Polymer Chemicals' bank account at the Hillside office of the National State Bank. He was able to accomplish this by having Harry Levinson sign the checks in blank.

The breakdown of the funds withdrawn is as follows:

| Year | Funds Withdrawn |
|------|-----------------|
| 1963 | $107,000.00 |
| 1964 | 236,400.00 |
| 1965 | 3,250.00 |
| 1966 | 462,941.00 |
| 1968 | 41,428.91 |
| 1969 | 125,000.00 |

It is clear that the cost for goods allegedly purchased from Polymer Chemicals was knowingly overstated by Resyn on its books and it resulted in a fraudulent understatement of corporate income tax due on the Resyn corporate income tax returns for the years 1963, 1964, 1967, 1968 and 1969.

As to the above recited transactions involving Chemical Traders, the Rambach companies, Witco Chemical Company and Atlas Paint Company, it is clear that the diversion to Chemical Traders of monies due Resyn resulted in a fraudulent overstatement of cost of goods sold regarding the Witco transactions and a fraudulent understatement of income in the Rambach transactions.

The Court finds that as a result of the alleged dealings involving Polymer Chemicals and Chemical Traders, the Resyn corporate income tax due on its return for the years 1963, 1964, 1965, 1966 and 1967 was underpaid and at least part of the underpayment for each year was due to fraud.

*　　*　　*　　*　　*　　*　　*

In considering all of the evidence before it, the Court is satisfied that both Chemical Traders and Polymer Chemicals are fictional entities used by Resyn for the fraudulent purpose of evading taxes and with the express purpose of diverting large sums of money to Leo Levitt, the sole shareholder of Resyn. Levitt controlled the withdrawals from the bank accounts of both Chemical Traders and Polymer Chemicals. While Harry Levinson signed many checks on the Polymer Chemicals' bank account, he signed them in blank, at Levitt's request and never knew what was done with the proceeds of the checks.

An analysis of the Chemical Traders' bank account and checks drawn on it shows that in 1966 it issued checks in the total amount of $462,921.00, of which $115,000.00 was written to cash. Traced to Levitt's personal accounts with various stock brokerage firms was the sum of $84,941.00. Additionally, a check drawn to an unknown payee was deposited to Levitt's account at the Merchant's Bank of New York and another check also payable to an unknown payee was deposited to Levitt's account at Edwards & Hanley, a stock brokerage firm.

In 1967 Chemical Traders issued checks totalling $320,000.00. Of this sum, a total of $106,500.00 was deposited into various personal accounts held by Levitt with various stock brokerage firms while the disposition of an additional $128,500.00 is unknown. Given the total control Levitt had over this account and his total control of the Resyn operation, his failure to testify as to unidentified deposits and withdrawals on the account is significant. * * *

In re Resyn Corp., 81-2 USTC par. 9808, at 88,686-88,691 (Bankr. D.N.J. 1981).

The bankruptcy court entered a judgment against Resyn on December 9, 1981. The District Court for the District of New Jersey entered opinions on November 22, 1982, August 19, 1986, and December 31, 1986, on appeal from the bankruptcy court's judgment. The Court of Appeals for the Third Circuit issued two opinions, Resyn Corp. v United States, 851 F.2d 660 (3d Cir. 1988), and In re Resyn Corp., 945 F.2d 1279 (3d Cir. 1991). The District Court entered its order on remand on July 9, 1992. There has been no appeal from that order.

L.  Sale of Resyn Corporation

Petitioner sold Resyn to Celanese Corp. in August 1977. In 1981, Resyn had no assets, but was liable for obligations to Celanese Corp. and to respondent.

M.   Notice of Deficiency

Dorgeval investigated petitioners and Resyn from 1970 to at least 1984.  He prepared a series of reports of proposed adjustments for Resyn and petitioners.  He completed the last report on March 14, 1984.  That report was the basis for the notice of deficiency in this case.  Respondent mailed the notice of deficiency on September 12, 1990.  Petitioners and Zuckerman signed consents to extend the time to assess tax for 1969 and 1970, which kept those years open until terminated.

Respondent determined that petitioners received constructive dividends from Resyn from 1963 to 1970 by analyzing Resyn's earned surplus for that period.  Respondent determined that Resyn paid checks for petitioners' benefit of $261,789 in 1967, $431,593 in 1968, and $341,725 in 1969.  Respondent deducted from those amounts the increases to petitioner's loan account, salary paid to petitioner, capital items, and additional business expenses.  Respondent determined that petitioners had unreported income of $25,022 in 1967 and $41,245.21 in 1968 based on Resyn checks used to pay petitioners' personal expenses. N.

Petitioners' 1963 Return

Petitioners timely filed their 1963 income tax return. Respondent did not offer a copy of petitioners' 1963 return into evidence.  Respondent's revenue agent's report for 1963 states that petitioners reported taxable income of $30,499.50 and that petitioner's total tax was $9,656.63.  Respondent had a copy of

an unsigned 1963 return for petitioners that also showed those amounts as petitioners' reported taxable income and total tax. The record does not show who prepared that purported return. There is no evidence that the unsigned return is the same as the return petitioners filed for 1963.

OPINION

A. Whether Respondent Violated Grand Jury Secrecy Rules

Before trial, petitioners moved to suppress evidence that respondent used in this case which petitioners contend includes matters and fruits of matters occurring before a Federal grand jury in violation of rule 6(e). The Court denied petitioners' pretrial motion to suppress. We reaffirm that ruling here.

1. Resyn Business Records Are Not Grand Jury Material in This Case

Generally, matters occurring before a Federal grand jury may not be disclosed. Fed. R. Crim. P. 6(e); In re Grand Jury Matter (Catania), 682 F.2d 61, 63 (3d Cir. 1982). Petitioners contend that Resyn's business records are matters occurring before a grand jury for purposes of rule 6(e). We disagree.

Resyn created its business records independently of a grand jury proceeding. Petitioners point out that business records created independently of a grand jury proceeding may be grand jury matters if disclosure of them will reveal the grand jury's deliberative process. See, e.g., In re Grand Jury Subpoena (Under Seal), 920 F.2d 235, 241 (4th Cir. 1990); In re Grand Jury Proceedings Relative to Perl, 838 F.2d 304, 306 (8th Cir. 1988);

Senate of Puerto Rico v. U.S. Dept. of Justice, 823 F.2d 574, 582 (D.C. Cir. 1987); Anaya v. United States, 815 F.2d 1373, 1379 (10th Cir. 1987); In re Special March 1981 Grand Jury (Almond Pharmacy), 753 F.2d 575, 578 (7th Cir. 1985); In re Grand Jury Matter (Garden Court), 697 F.2d 511, 512-513 (3d Cir. 1982); In re Grand Jury Matter (Catania), supra at 63; In re Grand Jury Matter (N.J. State Comm. of Investigation), 630 F.2d 996, 1000 (3d Cir. 1980).

Petitioners contend that disclosure of Resyn's records would reveal grand jury deliberations. We disagree. Respondent requested the books and records of Resyn. Respondent did not request all of the grand jury matter related to Resyn and petitioners. A general request for all grand jury records would, in effect, be a disclosure of the grand jury proceedings. See United States v. Stanford, 589 F.2d 285, 291 n.6 (7th Cir. 1978); In re Grand Jury Criminal Indictments 76-149 and 77-72, 469 F. Supp. 666, 671 (M.D. Pa. 1978).[3] We conclude that disclosure of Resyn's business records would not reveal secret grand jury deliberations.

---

[3] Respondent contends that use of Resyn's business records and other third party records that respondent obtained from the grand jury is no longer restricted by rule 6(e) because the bankruptcy court admitted those records into evidence at Resyn's bankruptcy trial. We need not decide respondent's contention in light of our conclusion that Resyn's business records are not grand jury material subject to the secrecy provisions of rule 6(e).

## 2.  Grand Jury Transcripts

Petitioners allege that respondent relied on grand jury transcripts to determine petitioner's civil tax liability in this case.  Petitioner points out that O'Byrne mentioned the transcripts in his criminal referral letter.  However, O'Byrne testified and we believe that he did not rely on grand jury testimony to develop petitioners' civil tax liability.  Revenue Agents Cronin and Dorgeval did not read the grand jury transcripts; they used Resyn's business records and third party records, all of which existed independently of the grand jury.  Thus, we are convinced that respondent did not use grand jury transcripts to develop the civil tax case.

## B.  Whether Petitioner Is Collaterally Estopped From Denying Factual Findings of the Bankruptcy Court

### 1.  Background

Petitioners contend that collateral estoppel does not prevent petitioner from contesting factual findings made by the bankruptcy court in In re Resyn Corp., 81-2 USTC par. 9808 (Bankr. D.N.J. 1981)  We disagree.

If collateral estoppel applies, issues which were litigated and decided in an earlier case on a different cause of action cannot be relitigated by the parties or their privies.  Montana v. United States, 440 U.S. 147, 153 (1979); Parklane Hosiery Co. v. Shore, 439 U.S. 322, 326 n.5 (1979); Commissioner v. Sunnen, 333 U.S. 591, 597 (1948).  Collateral estoppel protects

adversaries from the expense and vexation of multiple lawsuits, conserves judicial resources, and fosters reliance on judicial action by minimizing the possibility of inconsistent decisions. Montana v. United States, supra at 153-154; Meier v. Commissioner, 91 T.C. 273, 282-284 (1988). Collateral estoppel can apply in Federal tax cases. Commissioner v. Sunnen, supra at 598.

Collateral estoppel applies in the following circumstances: First, the matter at issue in the second suit is identical with the one decided in the first suit. Id. at 599-600. Second, there is a final judgment rendered by a court of competent jurisdiction. Peck v. Commissioner, 90 T.C. 162, 166 (1988), affd. 904 F.2d 525 (9th Cir. 1990); Gammill v. Commissioner, 62 T.C. 607, 613 (1974). Third, the parties to the second suit are the same as the parties to the first suit or in privity with them. Peck v. Commissioner, supra at 166-167; Gammill v. Commissioner, supra at 614-615. Fourth, the parties have actually litigated the matters at issue, and the resolution of those matters was essential to the prior decision. Commissioner v. Sunnen, supra at 598, 601. Fifth, the controlling facts and legal principles remain unchanged. Id. at 599-600. Sixth, there are no special circumstances that would warrant making exception to the normal rules of preclusion. Montana v. United States, supra at 162; Meier v. Commissioner, supra at 291-292.

2.   Elements of Collateral Estoppel

    a.   Identity of Matters at Issue

The first element for collateral estoppel is met because there are identical matters at issue in the bankruptcy trial and in the instant case, such as whether, and if so, how, petitioner diverted Resyn income to Polymer and Chemical Traders from 1963 to 1970.  The Government had to prove fraud by clear and convincing evidence in the bankruptcy case.  To prove fraud, the Government proved that Leo Levitt created two sham entities, Chemical Traders and Polymer, to conceal Resyn's income.  In re Resyn Corp., 81-2 USTC par. 9808 at 88,685-88,686.  The accounts, transactions, and entities in the bankruptcy case are the same as those in the instant case.  The instant case also involves the issue whether petitioners benefited from Resyn's unreported income.  However, the fact that the instant case has additional matters at issue does not bar collateral estoppel from applying to matters at issue which are the same in both cases.  Bertoli v. Commissioner, 103 T.C. 501, 508 (1994).

Petitioner points out that the bankruptcy court did not decide whether petitioner committed civil tax fraud.  The fact that the bankruptcy court did not decide whether petitioner was personally liable for additions to tax under section 6653(b) does not help petitioner.  The bankruptcy court found that petitioner used Polymer and Chemical Traders to divert Resyn funds to himself.  The bankruptcy court found that petitioner withdrew

from the Polymer account $107,000 in 1963, $236,400 in 1964, $3,250 in 1965, $462,941 in 1966, $41,428 in 1968, and $125,000 in 1969. The bankruptcy court found that Chemical Traders checks totaling $115,000 were written to cash in 1966. The bankruptcy court traced $84,941 to petitioner's stock brokerage accounts. The bankruptcy court found Chemical Traders checks totaling $106,500 written to petitioner's personal accounts in 1967. The bankruptcy court was required to and did decide whether fraud was present. It found clear and convincing evidence that petitioner diverted Resyn funds to himself through the Polymer and Chemical Traders accounts. Collateral estoppel precludes petitioner from relitigating that matter. Thus, petitioner may not relitigate the fact that he controlled the Polymer and Chemical Traders bank accounts and that Polymer and Chemical Traders were fictional entities which he created to divert funds to himself from Resyn. Petitioner may contest the extent to which he diverted funds from Resyn to himself, beyond that found by the bankruptcy court.

        b.    <u>Final Prior Judgment</u>

The second element for collateral estoppel is met because the bankruptcy court's decision is final.      c.    <u>Identity of or Privity With Parties</u>

The third element for collateral estoppel is met because petitioner is in privity with Resyn.

A sole or controlling stockholder can be in privity with his or her closely held corporation. <u>Marin v. Augedahl</u>, 247 U.S.

142, 145-146 (1918); <u>Bigelow v. Old Dominion Copper Mining & Smelting Co.</u>, 225 U.S. 111, 141 (1912); <u>Hawkins v. Glenn</u>, 131 U.S. 319, 329 (1889); <u>Sparks Nugget, Inc. v. Commissioner</u>, T.C. Memo. 1970-74 (sole shareholder in privity with corporation), affd. 458 F.2d 631 (9th Cir. 1972); see also <u>Seaboard Commercial Corp. v. Commissioner</u>, 28 T.C. 1034, 1047-1048 (1957) (successor corporate sole shareholder in privity with prior corporation); <u>Estate of Egan v. Commissioner</u>, 28 T.C. 998, 999 (1957), affd. 260 F.2d 779 (8th Cir. 1958) (transferee stockholder in privity with transferor corporation); <u>American Range Lines, Inc. v. Commissioner</u>, 17 T.C. 764, 771 (1951) (Court reviewed), affd. on this issue, modified in part and remanded 200 F.2d 844 (2d Cir. 1952) (shareholder bound by corporation, but corporation not bound by shareholder). Petitioner was president and sole shareholder of Resyn. He controlled Resyn. He personally used some of Resyn's unreported income. Petitioner attended the bankruptcy trial and had the same lawyer as Resyn. The fact that the same attorney represents the parties in both actions is a factor that may be considered in deciding whether the parties are in privity. See <u>Crane v. Commissioner of Dept. of Agric.</u>, 602 F. Supp. 280, 286 (D. Me. 1985). Petitioner does not dispute that he had an interest in opposing a finding that he caused Resyn to commit tax fraud by creating fictitious entities and diverting and not reporting Resyn income.

Petitioners contend that under the precedents of the Court of Appeals for the Third Circuit a shareholder and a corporation are not in privity. Hornstein v. Kramer Bros. Freight Lines, 133 F.2d 143 (3d Cir. 1943). In Hornstein, the Court of Appeals for the Third Circuit held that under Pennsylvania law shareholders and their corporations were not in privity in a tort case for collateral estoppel purposes. Id. at 146. That interpretation does not apply here because Pennsylvania law does not apply. Petitioners do not cite cases under New Jersey law which hold that a sole shareholder and his or her corporation are not in privity for collateral estoppel purposes.[4]

Petitioners contend that petitioner and Resyn were not in privity because the bankruptcy court had appointed a receiver to be responsible for Resyn's operations at that time. We disagree. When a nonparty to an action has control over the conduct of the litigation, it may be in privity with the party it controls and bound by the results of the litigation. American Safety Flight Systems, Inc. v. Garrett Corp., 528 F.2d 288, 289 (9th Cir. 1975). There is no evidence that the receiver controlled, attended, or was involved in the bankruptcy litigation. We

---

[4] In their answering brief, petitioners cite a New Jersey case involving whether the court would pierce the corporate veil and disregard the corporate form where there was no fraud or injustice. Lyon v. Barrett, 89 N.J. 294, 300, 445 A.2d 1153, 1156 (1982). That case does not hold or suggest that a sole shareholder is not in privity with his corporation for purposes of collateral estoppel.

believe petitioner controlled the bankruptcy litigation. Petitioner's attorney represented Resyn at and petitioner attended the bankruptcy trial. We conclude that Resyn and petitioner are in privity for collateral estoppel purposes.

### d. Actual and Necessary Litigation of the Matter in Issue

The fourth element for collateral estoppel is met because, during the 6-day bankruptcy trial, Resyn and the Commissioner actually and necessarily litigated the facts relating to petitioner's diversion of Resyn income. The test for deciding whether resolution of the litigated matters was essential to the prior decision is whether the issue was recognized by the parties in the prior proceeding as important and by the trier of fact as necessary to the judgment. Meier v. Commissioner, 91 T.C. at 284 n.14. The parties to the bankruptcy case and the bankruptcy court recognized that facts relating to petitioner's diversion of Resyn's income were important and it was necessary for the bankruptcy court to decide whether petitioner diverted Resyn's income to Polymer and Chemical Traders and whether Resyn was liable for fraud.

### e. Legal Principles Unchanged

The fifth element for collateral estoppel is present because the controlling facts and legal principles have not changed. Id. at 291.

f.    No Special Circumstances

The final element of collateral estoppel is present because petitioners do not contend nor do we find that there are special circumstances present that would warrant not applying the normal rules of preclusion.  Montana v. United States, supra; Meier v. Commissioner, supra at 291-292.

3.    Lack of Mutuality

Petitioners point out that there is no mutuality here because respondent would not be collaterally estopped from proceeding against petitioner even if respondent had lost the bankruptcy case.  Petitioners contend that collateral estoppel should not apply because there is no mutuality.  Gammill v. Commissioner, 62 T.C. at 614-615; Divine v. Commissioner, 59 T.C. 152, 156 (1972), affd. on this issue, revd. and remanded in part 500 F.2d 1041 (2d Cir. 1974).  Under the doctrine of mutuality, neither party may use a prior judgment to estop the other unless the judgment binds both parties.  Meier v. Commissioner, supra at 283.

Other than arguing that mutuality would not apply because the taxpayer here is not the same as that in In re Resyn Corp, 81 USTC par. 9808 (Bankr. D.N.J. 1981) (which we discussed in section B-2-c, above), petitioners made no convincing argument that mutuality would not apply here.  Further, mutuality is no longer a requirement for applying collateral estoppel.  Parklane Hosiery v. Shore, 439 U.S. 322 (1979); Meier v. Commissioner,

supra at 283; 1B Moore, Moore's Federal Practice, par. 0.441 [3.-2] at 527-535 (2d ed. 1985). Thus, petitioner's reliance on Gammill and Divine is misplaced.

4. Conclusion--Collateral Estoppel Applies

We conclude that petitioner is collaterally estopped from contesting the factual findings of the bankruptcy court in In re Resyn Corp., 81-2 USTC par. 9808 (Bankr. D.N.J. 1981). Collateral estoppel establishes all of the facts found by the bankruptcy court for purposes of the instant case. However, our findings of fact are also fully supported by the record in this case. The findings of fact by the bankruptcy court provide an alternative basis for many of those facts.

C. Whether Respondent's Determination Is Arbitrary

Respondent's determination is generally presumed to be correct. Welch v. Helvering, 290 U.S. 111, 115 (1933). Petitioners contend that respondent's determination is arbitrary and should not be presumed to be correct because respondent had no rational basis for determining that petitioner received constructive income from Chemical Traders and Polymer which he diverted from Resyn. We disagree.

A notice of deficiency that lacks a rational basis is arbitrary and not presumed to be correct. Llorente v. Commissioner, 649 F.2d 152, 156 (2d Cir. 1981), affg. in part and revg. and remanding in part on this issue 74 T.C. 260 (1980). To show that the Commissioner acted rationally, the record must link

the taxpayer to some tax-generating activity.  Id.; Schad v. Commissioner, 87 T.C. 609, 620 (1986), affd. without published opinion 827 F.2d 774 (11th Cir. 1987).  The record here clearly links petitioners to the unreported income.  Polymer and Chemical Traders had no business purpose.  Petitioner controlled the Polymer and Chemical Traders accounts.  We conclude that petitioner controlled Polymer because he caused Resyn to pay Polymer for fictitious sales, he had Levenson sign blank Polymer checks, and he withdrew substantial amounts of cash from the Polymer account.  We conclude that petitioner controlled Chemical Traders because he concealed it and its bank account from his accountants and bookkeepers, he withdrew substantial amounts of cash from the account, and he used funds from the account to buy stock.  Resyn paid petitioner's personal expenses directly. Petitioner paid at least $428,382 for personal stock investments with funds from Chemical Traders.  Petitioner withdrew cash from the Polymer and Chemical Traders accounts.  Records do not exist showing how petitioner used all of the funds that he diverted from Resyn to the Polymer and Chemical Traders accounts.

Petitioners contend that respondent's determination should not be presumed to be correct because respondent did not consider the possibility that petitioner replaced money he had previously taken from his brokerage accounts and because respondent did not analyze petitioners' net worth.  We know of no requirement and petitioners cite none that respondent must conduct a net worth

analysis when there is other evidence that connects petitioner to the diverted and unreported funds. Petitioners have not convinced us that respondent's determination was arbitrary. We therefore presume that respondent's determination is correct.

D.   Whether Petitioners Received Constructive Dividends

    1.   Respondent's Determination

Respondent determined that petitioners received but did not report constructive dividends from 1963 to 1970 which resulted in the following deficiencies:  $180,853.16 for 1963, $225,591.07 for 1964, $67,160.06 for 1965, $241,895.20 for 1966, $98,213.03 for 1967, $221,132.70 for 1968, $258,763.57 for 1969, and $17,945.61 for 1970.  Respondent based the determination on funds that petitioner diverted to petitioners' benefit through the Polymer and Chemical Traders bank accounts and on petitioners' personal expenses that Resyn paid.  Petitioners did not report these items on their income tax returns.  Respondent's determination is presumed to be correct.  Welch v. Helvering, supra at 115; Rule 142(a).

    2.   Diversion of Funds to Polymer Account

Petitioners contend that petitioner's diversion of funds to the Polymer bank account was not a constructive dividend to them because petitioner used those diverted funds to pay business expenses.  Petitioner testified that the alkyd resin business was very competitive during the years in issue and that the Tepperman brothers told him that they would give him business from Atlas if

petitioner paid them in cash.  During that time, resin cost about 10.5 cents per pound.  Petitioner said Atlas paid about 13 cents per pound and petitioner paid Atlas 3 cents in cash.  Petitioner said he got cash by forming Polymer and depositing in its bank account the difference between the cost of resin and the amount that Atlas paid.  Petitioner then bought and cashed cashier's checks.  Resyn wrote checks totaling $87,750.12 in 1963, which were deposited in the Polymer checking account in 1966.  A total of $56,564.76 deposited in the Polymer checking account in 1969 was from checks written in 1968.  These delays are inconsistent with petitioner's theory that he had to make cash payments to Atlas.  It is implausible that the Tepperman brothers would wait from 1963 to 1966 to be paid.

The Tepperman brothers died before trial was held in this case.  The opinion of the bankruptcy court does not indicate, and petitioners do not contend, that Resyn raised the business expense theory at the bankruptcy trial.  Petitioner's claim that he paid all the money in the Polymer account to the Tepperman brothers is not persuasive.

### 3.   Diversion of Funds to Chemical Traders

Petitioner controlled the Chemical Traders account.  He did not tell his accountants and bookkeepers about it.  He withdrew funds from the Chemical Traders account during each of the years from 1964 to 1969 to buy stock and did not report those amounts. He withdrew cash in 1970 and other years.

4.   Short Term Loans

Petitioners contend that amounts Resyn paid for petitioners' personal expenses which respondent contends were constructive dividends were loans to petitioner from Resyn.  Courts apply special scrutiny to the characterization by corporations that advances made by them to their sole stockholders are loans. Turner v. Commissioner, 812 F.2d 650, 654 (11th Cir. 1987), affg. T.C. Memo. 1985-159.  Self-serving statements of intent, absent objective economic indicia of debt, are of little value to sole stockholders in unreported income cases.  Id. at 654.  Written evidence of debt, such as consistent bookkeeping and consistent financial reporting, may be little more than additional declarations of intent.  Id.  The form of the transaction and the labels used by the parties have less significance when the corporation is closely held because the parties can mold the transaction at their will.  Fin Hay Realty Co. v. United States, 398 F.2d 694, 697 (3d Cir. 1968); Calumet Indus., Inc. v. Commissioner, 95 T.C. 257, 286 (1990).

In deciding whether a bona fide loan exists, we consider: (a) Whether there is a note or other evidence of indebtedness and whether the lender charges interest, Clark v. Commissioner, 18 T.C. 780, 783 (1952), affd. 205 F.2d 353 (2d Cir. 1953); (b) whether there is a fixed repayment schedule, id. at 783; Frierdich v. Commissioner, T.C. Memo. 1989-393, affd. 925 F.2d 180 (7th Cir. 1991); (c) whether the lender requests any security

or collateral, <u>Zimmerman v. United States</u>, 318 F.2d 611, 613 (9th Cir. 1963); (d) whether there is a written loan agreement, <u>Road Materials, Inc. v. Commissioner</u>, 407 F.2d 1121, 1123 (4th Cir. 1969), affg. T.C. Memo. 1967-187; (e) whether the parties' records, if any, treat the transaction as a loan, <u>id.</u> at 1124-1125; and (f) whether the borrower has made any repayments, <u>Estate of Ames v. Commissioner</u>, a Memorandum Opinion of this Court dated Feb. 7, 1946. The first four of these factors favor respondent because there is no evidence that petitioner or Resyn had a note, loan agreement, or any other written instrument of indebtedness, or agreed to any rate of interest or a repayment schedule, or provided security. Finally, there is no evidence that Resyn sought payments from petitioner.

Petitioners argue that petitioner repaid the loans by forgoing salary and by making repayments. Petitioners contend that these repayments are recorded in Resyn's books. However, Resyn's books showing repayments are not in evidence. There is no evidence that petitioner forfeited any salary to make loan repayments in excess of amounts taken into account by respondent.

Petitioners argue that the amounts that Resyn paid for their personal benefit are loans because Resyn's records treat them as a loan receivable. We disagree. This factor alone is not sufficient to show that those payments are loans. <u>Road Materials, Inc. v. Commissioner</u>, <u>supra</u> at 1124; <u>Calumet Indus., Inc. v. Commissioner</u>, <u>supra</u> at 288; <u>Baird v. Commissioner</u>, 25

T.C. 387, 394 (1955). Resyn's records are not sufficient to show Resyn's and petitioner's intent; rather, we believe the recording of petitioners' personal expenses as loans from Resyn was part of petitioner's scheme to avoid reporting income.

Petitioners argue that the facts here are like those in Boshwit Bros., Inc. v. Commissioner, T.C. Memo. 1982-156. We disagree. In that case, we found that the corporation made loans to its shareholder because we believed the shareholder's testimony that he intended to repay the loans and because the account showed regular credits and a decreasing balance. Id. Here, petitioner did not show that he intended to repay the loan or that Resyn gave him regular credits for loan repayments. Thus, petitioners' reliance on Boshwit Bros. is not persuasive.

5. Traceable Amounts

Petitioners point out that respondent could not trace all of the funds that petitioner diverted to the Polymer account. This fact does not help petitioner because the determination is valid and, as discussed below at section F-2, respondent traced significant amounts to petitioners for each year by clear and convincing evidence.

Petitioners contend that petitioners should be charged with constructive dividends only for amounts that respondent can prove were spent for petitioners' personal benefit. We disagree. Respondent determined that all deposits in the Polymer and Chemical Traders accounts during the years in issue are income to

petitioners because Polymer and Chemical Traders had no business purpose, petitioner controlled the Polymer and Chemical Traders bank accounts, and petitioner could and did use those accounts for his benefit. As discussed above, respondent's determination is presumed to be correct, and petitioners have not proven otherwise.

6. Constructive Dividends for 1970

Respondent determined that petitioners did not report the following income in 1970: $5,371 from Polymer, $15,600 from Chemical Traders, $4,910 from Factory Expense, and $41,095 from Van Syckle Chemical Plant. In 1970, petitioners reported $27,300 of income without identifying the source. Petitioners contend that we should reduce any constructive dividend for 1970 by $27,300 because they reported that amount, which represents their estimate of the value of Chemical Traders and Polymer Chemicals transactions on their 1970 return. We disagree. Petitioners did not show how the $27,300 they reported related to any of the amounts respondent determined to be unreported income. They rely on Goldstein's testimony that it was to cover income adjustments from respondent's audit for 1970. Goldstein's testimony does not prove respondent's determination to be incorrect because it does not show how the reported income of $27,300 relates to any of respondent's adjustments for 1970.

7.   Conclusion

We conclude that payments to or on behalf of petitioners by Resyn, Chemical Traders, and Polymer were constructive dividends to petitioners in the years paid in the amounts determined by respondent.

E.   Whether Petitioner Is Liable For Fraud For 1963

Respondent determined that petitioner is liable for the addition to tax for fraud under section 6653(b) for 1963 to 1970. We discuss 1963 in this section because of certain facts applicable only to that year.  We will discuss whther  petitioner is liable for fraud for 1964 to 1970 in section F, below.

Petitioners contend that respondent did not prove that petitioner committed fraud for 1963 because respondent did not offer into evidence an original or copy of petitioners' 1963 return.  We agree.  A taxpayer is not liable for the addition to tax for fraud for a year if the return for that year is not in evidence and there is no evidence about the contents of the return.  Drieborg v. Commissioner, 225 F.2d 216, 219-220 (6th Cir. 1955), affg. in part and revg. in part a Memorandum Opinion of this Court dated Feb. 24, 1954.  Secondary evidence is admissible to prove the contents of a destroyed or lost income tax return.  Granquist v. Harvey, 258 F.2d 599, 601 (9th Cir. 1958); Estate of Clarke v. Commissioner, 54 T.C. 1149, 1163 (1970); Rubinstein v. Commissioner, 29 T.C. 861 (1958), affd. per curiam 264 F.2d 478 (3d Cir. 1959).

Respondent has shown that the amount of petitioners' income for 1963 stated in the revenue agent's record is the same as amounts stated on petitioners' unsigned return.  However, there is no evidence that these amounts are the same as those reported on petitioners' 1963 return.  We conclude that there is insufficient evidence of petitioners' 1963 return to prove fraud. Rubinstein v. Commissioner, 264 F.2d at 479.

F.    Whether Petitioner Is Liable For Fraud for 1964 to 1970

   1.    Background

A taxpayer who commits fraud is liable for an addition to tax equal to 50 percent of the underpayment.  Sec. 6653(b). Respondent has the burden of proving fraud by clear and convincing evidence.  Sec. 7454(a); Rule 142(b).  First, respondent must prove the existence of an underpayment.  Parks v. Commissioner, 94 T.C. 654, 660 (1990).  Respondent may not rely on petitioners' failure to carry the burden of proving the underlying deficiency.  Id. at 660-661; Petzoldt v. Commissioner, 92 T.C. 661, 700 (1989).  Second, respondent must show that petitioner intended to evade taxes he believed to be owing by conduct intended to conceal, mislead, or otherwise prevent tax collection.  Stoltzfus v. United States, 398 F.2d 1002, 1004 (3d Cir. 1968); Parks v. Commissioner, supra at 661; Rowlee v. Commissioner, 80 T.C. 1111, 1123 (1983).

2.  Underpayment

Petitioners contend that respondent did not establish by clear and convincing evidence that petitioner underpaid tax.  We disagree.

A controlling shareholder who causes a corporation, for no business purpose of its own, to transfer earnings to another entity which the shareholder controls may be taxed as receiving income in the amount of the funds transferred.  Commissioner v. Makransky, 321 F.2d 598, 602 (3d Cir. 1963), affg. 36 T.C. 446 (1961); Biltmore Homes, Inc. v. Commissioner, 288 F.2d 336 (4th Cir. 1961), affg. T.C. Memo. 1960-53; Helvering v. Gordon, 87 F.2d 663 (8th Cir. 1937); Lonsdale v. Commissioner, 32 F.2d 537 (8th Cir. 1929), affg. 11 B.T.A. 659 (1928).  The control which the taxpayer has over the amounts transferred may cause those amounts to be taxable income to the taxpayer.  McSpadden v. Commissioner, 50 T.C. 478, 490 (1968) (false mortgage scheme). Funds that petitioner diverted from Resyn to the Polymer and Chemical Traders accounts were taxable income to him.  James v. United States, 366 U.S. 213, 219 (1961) (embezzled funds over which the taxpayer had complete dominion and control were taxable income).

The Polymer and Chemical Traders accounts were nominee or conduit bank accounts for petitioner during the years in issue. Polymer and Chemical Traders had no business purpose.  Petitioner completely controlled them.  Petitioner diverted Resyn funds to

the Polymer and Chemical Traders bank accounts.  He caused the following amounts to be deposited into the Polymer bank account: $238,555.24 in 1964, $87,750.12 in 1966, $40,818.47 in 1968, $122,559.81 in 1969, and $5,370.72 in 1970.  He caused at least the following amounts to be deposited into the Chemical Traders bank account: $297,115.19 in 1964, $248,435.81 in 1965, $526,815.33 in 1966, $253,767.62 in 1967, $66,554.58 in 1968, $70,878.23 in 1969, and $15,600 in 1970.  Thus, petitioner diverted funds from Resyn to the accounts he controlled in each year from 1964 to 1970.  Petitioner wrote Chemical Traders checks to cash of at least $140,199 in 1965, $76,000 in 1966, $167,000 in 1967, $89,500 in 1968, $45,500 in 1969, and $19,500 in 1970. Petitioner wrote checks to cash on the Polymer account that Levenson had signed.  Those checks totaled at least $40,000 in 1968 and $108,000 in 1969.  Petitioner did not report any of these amounts on his income tax returns.

Petitioner contends that respondent did not prove an underpayment by clear and convincing evidence because respondent could not show what petitioner did with all of the diverted funds.  We disagree.  As discussed above, we conclude that those funds became taxable to petitioner when he diverted those funds to the Polymer and Chemical Traders accounts.  Further, even if respondent were required to show that petitioners used diverted funds for each year from 1964 to 1970, we conclude that respondent has done so by clear and convincing evidence.

Chemical Traders paid for petitioner's stock investments in at least the following amounts:  $83,500 in 1964, $20,635 in 1965, $153,035 in 1966, $128,007 in 1967, $2,007 in 1968, and $8,350 in 1969.  Petitioner did not report his receipt from Polymer of checks made out to cash.  Resyn paid personal benefits for petitioners of at least $261,789 in 1967, $431,592 in 1968, and $341,725 in 1969 (total for those 3 years is $1,035,106).  Petitioners did not report those amounts.

We conclude that respondent has proven by clear and convincing evidence that petitioner diverted funds from Resyn to himself using the Polymer and Chemical Traders accounts from 1964 to 1970 and did not report them.  P.R. Farms, Inc. v. Commissioner, 820 F.2d 1084 (9th Cir. 1987), affg. T.C. Memo. 1984-549; Worcester v. Commissioner, 370 F.2d 713, 715 (1st Cir. 1966), affg. in part and vacating and remanding in part T.C. Memo. 1965-199; Biltmore Homes, Inc. v. Commissioner, supra at 340-341.

### 3.   Fraudulent Intent

Respondent must prove by clear and convincing evidence that petitioner had fraudulent intent.  Parks v. Commissioner, supra at 664.  For purposes of section 6653(b), fraud means actual, intentional wrongdoing, Mitchell v. Commissioner, 118 F.2d 308, 310 (5th Cir. 1941), revg. 40 B.T.A. 424 (1939), or the intentional commission of an act for the specific purpose of evading a tax believed to be owing, Webb v. Commissioner, 394

F.2d 366, 377 (5th Cir. 1968), affg. T.C. Memo. 1966-81. Fraud may be proven by circumstantial evidence because direct evidence of the taxpayer's intent is rarely available. Stephenson v. Commissioner, 79 T.C. 995, 1005-1006 (1982), affd. 748 F.2d 331 (6th Cir. 1984).

The courts have developed a number of objective indicators or "badges" of fraud. Recklitis v. Commissioner, 91 T.C. 874, 910 (1988). Several badges of fraud are present in this case: (a) Substantially understating income for several years; (b) diverting corporate funds; (c) having inadequate books and records; (d) dealing in large amounts of cash; (e) using fictitious names; (f) concealing accounts from Resyn's and petitioners' accountants; and (g) giving false, misleading, and inconsistent testimony at trial. Bradford v. Commissioner, 796 F.2d 303, 307-308 (9th Cir. 1986), affg. T.C. Memo. 1984-601; Ruark v. Commissioner, 449 F.2d 311, 312-313 (9th Cir. 1971), affg. T.C. Memo. 1969-48; Meier v. Commissioner, 91 T.C. at 298.

a. Substantially Understating Income Tax Liability

A pattern of substantially underreporting income tax liability over several years may be evidence of fraud. Holland v. United States, 348 U.S. 121, 137-139 (1954); Estate of Mazzoni v. Commissioner, 451 F.2d 197, 202 (3d Cir. 1971), affg. T.C. Memo. 1970-37; Rogers v. Commissioner, 111 F.2d 987, 989 (6th Cir. 1940), affg. 38 B.T.A. 16 (1938). Petitioner substantially understated income tax liability by $225,591 for 1964, $67,160

for 1965, $241,895 for 1966, $98,213 for 1967, $221,132 for 1968, $258,763 for 1969, and $17,945 for 1970.

### b. Corporate Diversions for Personal Use

A taxpayer's diversion of corporate funds to the taxpayer's own use is evidence of fraud. Solomon v. Commissioner, 732 F.2d 1459, 1460-1461 (6th Cir. 1984), affg. T.C. Memo. 1982-603; United States v. Brill, 270 F.2d 525, 527 (3d Cir. 1959). As discussed above, petitioner diverted a substantial amount of funds from Resyn using Polymer and Chemical Traders as nominee accounts. He diverted to Chemical Traders $297,115.19 in 1964, $248,435.81 in 1965, $526,815.33 in 1966, $253,767.62 in 1967, $66,554.58 in 1968, $70,878.23 in 1969, and $15,600 in 1970. He diverted to Polymer $238,556 in 1964, $87,750.02 in 1966, $40,517.47 in 1968, $122,649.81 in 1969, and $5,370.72 in 1970. After petitioner diverted funds to Polymer and Chemical Traders, he withdrew cash from the Polymer and Chemical Traders accounts, and used the Chemical Traders account to pay for his stock investments. In addition to the amounts petitioner diverted to himself through Polymer and Chemical Traders, Resyn paid substantial amounts for petitioners' personal expenses which petitioners did not report.

### c. False or Inadequate Records

False entries in books and records and false purchase invoices are compelling evidence of fraud. Marienfeld v. United States, 214 F.2d 632, 634-635 (8th Cir. 1954); United States v.

<u>Lange</u>, 161 F.2d 699, 703 (7th Cir. 1947).  Petitioner caused Polymer to issue false purchase invoices to Resyn.

A taxpayer's failure to maintain accurate records may be a badge of fraud.  <u>Merritt v. Commissioner</u>, 301 F.2d 484, 487 (5th Cir. 1962), affg. T.C. Memo. 1959-172; <u>Reaves v. Commissioner</u>, 295 F.2d 336, 338 (5th Cir. 1961), affg. 31 T.C. 690 (1958); <u>Grosshandler v. Commissioner</u>, 75 T.C. 1, 20 (1980).  Petitioner did not have records showing what he did with most of the money in the Polymer and Chemical Traders accounts.

### d.    <u>Dealing in Large Amounts of Cash</u>

A taxpayer's use of cash and cashier's checks to conceal income is evidence of fraud.  <u>Bradford v. Commissioner</u>, <u>supra</u> at 308; <u>United States v. Chapman</u>, 168 F.2d 997, 1000 (7th Cir. 1948).  We may infer that a taxpayer's excessive use of checks drawn to cash was to conceal unreported income.  See <u>Gariepy v. United States</u>, 189 F.2d 459, 463 (6th Cir. 1951).  Petitioner used large cash transactions.  He used cashier's checks to buy stock.  All of his Polymer withdrawals were in cash.  He wrote Chemical Traders checks to cash totaling $160,824 in 1965, $160,541 in 1966, $317,000 in 1967, $89,500 in 1968, $43,850 in 1969, and $19,500 in 1970.  There do not appear to be any valid business reasons for these large cash transactions.

### e.    <u>Using Fictitious Names</u>

Use of a bank account in the name of a nominee can be evidence of fraud.  <u>United States v. Ratner</u>, 464 F.2d 101, 105

(9th Cir. 1972); Elwert v. United States, 231 F.2d 928, 935 (9th Cir. 1956).  Petitioner used Chemical Traders and Polymer to divert funds from Resyn for his personal use.

Petitioners contend that Chemical Traders and Polymer were legitimate businesses.  We disagree.  Petitioner is collaterally estopped from so claiming.  Even if petitioner were not collaterally estopped, respondent has clearly shown that petitioner used Chemical Traders and Polymer to divert and conceal income from 1964 to 1970.

### f.   Concealing Income From Return Preparers

Concealing income from a taxpayer's tax preparer can be evidence of fraud.  Korecky v. Commissioner, 781 F.2d 1566, 1569 (11th Cir. 1986), affg. T.C. Memo. 1985-63; Farber v. Commissioner, 43 T.C. 407, 420, modified 44 T.C. 408 (1965).  Petitioner did not give Levenson or Goldstein records showing that Chemical Traders existed, that Resyn's payments to Polymer were for fictitious transactions, that he diverted income from Resyn to Polymer and Chemical Traders, or how he used funds in the Polymer and Chemical Traders accounts.

### g.   False and Misleading Testimony

False, misleading, and inconsistent testimony is a badge of fraud.  Bradford v. Commissioner, supra at 307.  Petitioner falsely testified (i) that Chemicals Traders and Polymer were legitimate businesses; (ii) that Chemical Traders did business at 128 Clinton Avenue in Newark, New Jersey, and that he was in

charge of the offices there; (iii) that Chemical Traders and Polymer were legitimate businesses that bought and sold products under their own names; (iv) that secrecy was not the reason he wrote checks to cash, and cashier's checks to withdraw funds from the Polymer and Chemical Traders accounts; (v) that Levenson suggested the Polymer scheme; and (vi) that he never stopped at Levenson's house to have Levenson sign blank checks. Petitioner testified that petitioner Ruth Levitt was an original subscriber of Welev stock. However, the corporate minutes show that she was not. Finally, petitioner testified that he had nothing to do with preparing Ruth Levitt's income tax return for 1986. However, Ruth Levitt testified that he always handled their tax returns and that she never participated in preparing income tax returns.

### 4. Petitioners' Contentions

Petitioners contend that petitioner's concealment in 1986 of the Welev transaction is not relevant to proving that petitioner committed fraud for the tax years in issue because it occurred after the years in issue. We do not consider petitioner's acts of concealment in 1986 in deciding the fraud issue. However, we consider the fact that petitioner used Resyn to pay for Welev during the years in issue but did not report the amounts that Resyn paid.

Petitioners contend that the fact that Philbin never saw petitioner involved in Resyn's bookkeeping or instructing anyone

to divert funds from Resyn shows that petitioner did not divert funds. We disagree. Petitioner concealed the Chemical Traders account from Philbin. Petitioner knew that Resyn paid Polymer for fictitious transactions. Petitioner withdrew a substantial amount of funds from the Polymer and Chemical Traders bank accounts in cash and cashier's checks. Philbin's testimony does not lead us to change our conclusion based on the overwhelming evidence that petitioner arranged the diversion of funds.

Petitioners contend that Levenson "was the architect of the scheme". The record clearly shows otherwise. Levenson did not know about Chemical Traders. Petitioner directed Levenson to sign and endorse all of the Polymer checks in blank. Levenson did not benefit from Polymer. Petitioner controlled Resyn, Polymer, and Chemical Traders. Levenson did not.

Petitioners contend that respondent did not prove fraud because respondent did not call Hall, who directed the postings, to testify. We disagree. Even without Hall's testimony, respondent has clearly shown that petitioner devised, operated, and benefited from his scheme to divert income from Resyn through Polymer and Chemical Traders to himself and his family.

5.  Conclusion

We conclude that part of petitioner's underpayment of tax for each year from 1964 to 1970 is due to fraud.

G.    Statute of Limitations

Petitioners contend that the time to assess tax for petitioners for 1963 to 1969 has expired.[5]  We disagree as to 1964 to 1969 and agree as to 1963.

The Commissioner is generally required to assess tax within 3 years of the date the return is filed or due, whichever is later.  Sec. 6501(a).  There is no limit on the time to assess tax if the Commissioner proves fraud.  Sec. 6501(c)(1).  We have found that petitioner is liable for fraud for each of the years 1964 to 1970.  Thus, respondent may assess tax for those years.  Sec. 6501(c)(1).  However, the time to assess tax for 1963 has expired because respondent has not proven fraud for that year.

H.    Whether Ruth Levitt Is an Innocent Spouse

1.    Background

Petitioners contend that Ruth Levitt is an innocent spouse under section 6013(e).

Spouses who file joint tax returns are jointly and severally liable for tax.  Sec. 6013(d)(3).  Petitioners argue that Ruth Levitt is not liable for the deficiencies and the addition to tax for substantial understatement of income tax because she is an innocent spouse under section 6013(e).  To qualify as an innocent spouse for any of the years in issue, petitioners must prove that: (a) Ruth Levitt filed a joint return for the year; (b)

---

[5] Petitioners concede that respondent may assess tax for 1970 under sec. 6501(c)(4).

there is a substantial understatement of income tax attributable to grossly erroneous items of the other spouse on the return; (c) she did not know or have reason to know of the substantial understatement when she signed the return; and (d) it would be inequitable to hold her liable for the deficiency attributable to the substantial understatement. Sec. 6013(e)(1). Failure to meet any of these requirements precludes a taxpayer from qualifying as an innocent spouse. Sec. 6013(e)(1); Purcell v. Commissioner, 826 F.2d 470, 473 (6th Cir. 1987), affg. 86 T.C. 228 (1986). Courts should construe the innocent spouse exception in view of the congressional purpose of protecting innocent taxpayers from injustice. Sanders v. United States, 509 F.2d 162, 166-167 (5th Cir. 1975).

Respondent concedes that Ruth Levitt meets the requirements to qualify as an innocent spouse under section 6013(e) except that she knew or had no reason to know of the understatements when she signed the returns and that it is inequitable to hold her liable. We need not decide whether Ruth Levitt knew or had reason to know of the understatements because we conclude that it is not inequitable to hold her liable.

2.    Whether It Is Inequitable to Hold Ruth Levitt Liable

A taxpayer who claims innocent spouse relief must prove that, taking into account all the facts and circumstances, it is inequitable to hold her or him liable for the deficiency. Sec. 6013(e)(1)(D). Normal support is not a significant

benefit for purposes of deciding whether denial of innocent spouse relief is inequitable under section 6013(e)(1)(D). Flynn v. Commissioner, 93 T.C. 355, 367 (1989).

Petitioners contend that Ruth Levitt did not significantly benefit from the unreported income. We disagree. The statute by its terms no longer bars relief if the purported innocent spouse received a significant benefit, but it continues to be a factor. Estate of Krock v. Commissioner, 93 T.C. 672, 678 (1989). The benefit may be direct or indirect. Id. at 678. Ruth Levitt enjoyed the benefits of the understatements during the years in issue. She drove new cars, had a nursemaid, sent her children to camp, and lived materially well. She had the services of a chauffeur and handyman. Some of her children attended private schools. She shopped extensively. Resyn paid about $1,035,106 for those personal expenses of petitioners from 1967 to 1969. She benefited from petitioners' tax deductions for charitable contributions that Resyn paid in 1967 and 1968. Resyn also paid for petitioners to buy Welev stock that Ruth Levitt sold in 1986, reporting a capital gain of $999,338. There is no indication that Ruth Levitt's benefit from unreported income was any different from 1964 to 1966. We believe that petitioners' unreported income allowed her to have the standard of living that she did during the

years in issue.  She remained married to petitioner during the years in issue.  We believe that Ruth Levitt fully shared in the benefits and the tax savings from the omitted income and that the understatements enabled her to maintain a standard of living that she would not have enjoyed otherwise.  See Scarafile v. Commissioner, T.C. Memo. 1991-512.  Ruth Levitt benefited significantly from the omitted income.

Petitioners rely on Kistner v. Commissioner, 18 F.3d 1521 (11th Cir. 1994) revg. and remanding T.C. Memo 1991-463, and Flynn v. Commissioner, supra, for the proposition that a spouse does not significantly benefit for purposes of section 6013(e)(1)(D) if the level of support received during the years in issue was no different than before those years.  However, even with no change in the standard of living, the spouse may fail to meet the requirement of section 6013(e)(1)(D).  In Flynn, we found that the spouse did not benefit from the understatements.  Flynn v. Commissioner, supra at 367-368.

Petitioners have not shown that it would be inequitable to hold Ruth Levitt liable for the deficiency.  Consequently, we hold that she is not entitled to relief as an innocent spouse under section 6013(e).

To reflect the foregoing,

<u>Decision will be</u>

<u>entered under Rule 155</u>.