T.C. Memo. 2002-79

UNITED STATES TAX COURT

DOMER L. ISHLER, Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

20TH CENTURY MARKETING, INC., Petitioner <u>v</u>. COMMISSIONER OF
INTERNAL REVENUE, Respondent

Docket Nos. 13468-99, 13469-99.[1]    Filed March 28, 2002.


<u>Michael K. Wisner</u>, <u>David E. McGehee</u>, and <u>D. Ashley Jones</u>,
for petitioners.

<u>Marshall R. Jones</u>, for respondent.


MEMORANDUM FINDINGS OF FACT AND OPINION

COLVIN, <u>Judge</u>:  Respondent determined deficiencies in
petitioners' Federal income tax and additions to tax as follows:

--------

1  These cases were consolidated for trial, briefing, and
opinion.

## Domer L. Ishler

| Year | Deficiency | Additions to tax Sec. 6653(b)(1)(A) | Sec. 6653(b)(1)(B) | Sec. 6661 |
|---|---|---|---|---|
| 1987 | $112,227 | $84,170 | [1] | $28,057 |
| 1988 | 396,659 | 297,494 | -- | 99,165 |

[1] 50 percent of the interest due on $112,227.

## 20th Century Marketing, Inc.

| Year ended | Deficiency | Additions to tax Sec. 6653(b)(1)(A) | Sec. 6653(b)(1)(B) | Sec. 6661 |
|---|---|---|---|---|
| Dec. 31, 1987 | $118,314 | $88,736 | [1] | $29,579 |

[1] 50 percent of the interest due on $118,314.

Domer L. Ishler (petitioner) was president and owned all of the stock of petitioner corporation, 20th Century Marketing, Inc. (TCM). TCM earned commissions on sales of electronic components to Chrysler Corp. Petitioner arranged for a Hong Kong corporation, Camaro Trading Co., Ltd. (Camaro), to receive commissions which otherwise would have been paid to TCM. The issues in dispute primarily relate to whether Camaro was paid for services performed by Camaro, as petitioner contends, or as a device to avoid taxation of most of that commission income, as respondent contends.

After concessions,[2] the issues for decision are:

1.  Whether TCM had unreported income of $307,696 in 1987 and whether petitioner had unreported income of $308,723 in 1987 and $1,421,218 in 1988.  We hold that they did.

2.  Whether petitioner is liable for the addition to tax for fraud under section 6653(b) for 1987 and 1988 and whether TCM is liable for fraud for 1987.  We hold that petitioner is and that TCM is not.

3.  Whether the statute of limitations bars assessment of tax for 1987 and 1988.  We hold that it does not.

4.  Whether petitioner is liable for the addition to tax under section 6661 for substantial understatement for 1987 and 1988, and whether TCM is liable for the section 6661 addition to tax for 1987.  We hold that they are.

Unless otherwise indicated, section references are to the Internal Revenue Code in effect for the years in issue.  Unless otherwise indicated, Rule references are to the Tax Court Rules of Practice and Procedure.

---

[2]  Respondent concedes that petitioner corporation overreported interest income by $1,632.73 for 1987, and that petitioner overreported interest income of $6,359 for 1988.

FINDINGS OF FACT

Some of the facts have been stipulated and are so found.

A.  Petitioners

1.  Domer Ishler

Petitioner lived in Huntsville, Alabama, when he filed his petition in this case.  He graduated from high school and completed 6 months of trade school in electronics.

Lela Ishler is petitioner's mother, and her husband is D. Marvin Ishler.  Marvin M. Ishler is petitioner's brother.  Traci Ishler is petitioner's daughter.  Joyce Ishler Eller (Eller) is petitioner's former wife.  Melonee Hudson (Hudson) was petitioner's niece.  She died in July 1994.

During the 1980s, petitioner conducted business and investment activities through a sole proprietorship named Double D Investments.  Petitioner maintained a checking account at Central Bank in Huntsville for Double D (the Double D account).

2.  20th Century Marketing, Inc.

TCM's principal office was in Huntsville when it filed its petition in this case.  Petitioner incorporated TCM in 1967 and was its only employee until 1970.  TCM was a C corporation for 1987 and an S corporation for 1988.  Petitioner was TCM's sole shareholder and chief executive officer in 1987 and 1988.  TCM had 34 employees and annual sales of about $90 million by 1989.

TCM sold electronic components provided by manufacturers, or by intermediaries such as Nissei Sangyo America, Ltd. (NSA), to manufacturers such as Chrysler. TCM earned commissions on its sales.

B. Other Business Entities

1. NSA

NSA is an Illinois corporation and subsidiary of Hitachi. It supplied electronic and mechanical components to car manufacturers during the years in issue.

2. Camaro

Camaro was incorporated by Philip Lawrence Choy (Choy) under the laws of Hong Kong on July 19, 1983. Choy was Camaro's management nominee.[3] Camaro opened a Hong Kong dollar-denominated checking account and a U.S. dollar-denominated savings account at the Hongkong & Shanghai Banking Corp., Ltd. (HSBC), in Hong Kong in July 1983. Petitioner's initial contact with Camaro was in 1983, through his friend, Richard Adler, whose common law wife, Kay Adler (also known as Jo Ying Ying or Kay Chou), was one of

---

[3] Kay Chou and her brother-in-law Chen paid Choy, a registered agent in Hong Kong, to incorporate Camaro, using nominee companies as Camaro's shareholders. He substituted the names of the shareholders in the corporate charter. Camaro was ready for business the next day. The names of Chou and Chen do not appear in Camaro's records because Camaro's shareholders were nominee companies. Choy was not an officer of Camaro.

Camaro's beneficial owners.[4]

Camaro had no employees, salesmen, traders, or marketers. Camaro had no office or employees in Alabama.

### a. Petitioner's Signature Authority Over Camaro Funds

On August 4, 1983, Choy and petitioner opened a U.S. dollar-denominated savings account and a Hong Kong dollar-denominated checking account in Camaro's name at Standard Chartered Bank (SCB) in Hong Kong. Only Choy and petitioner had signature authority over those accounts. The accounts were closed on May 1, 1989.

In 1986, at petitioner's suggestion to Choy, Thomson McKinnon Securities, Inc. (TM), opened a brokerage account for Camaro. Only petitioner had signature authority over that account. On September 30, 1987, TM issued a $23,250 check to Camaro from funds in Camaro's TM account. Petitioner endorsed the check as Camaro's agent to Valar Resources, Ltd., a Canadian company. Camaro's TM account was closed on February 22, 1988.

### b. Petitioner's Diversion of $12,328 of TCM Commissions to Camaro in 1983-84

NSA sold electronic components to SCI Components, Inc. (SCI), of Huntsville in 1983 and 1984. From August 23 to November 21, 1983, NSA sent seven invoices to SCI for sales of electronic components. On March 30, 1984, NSA issued a $12,328

---

[4] Kay Chou's brother-in-law Chen was Camaro's other beneficial owner in 1987 and 1988.

check to TCM for commissions on those sales.  Petitioner returned the check to NSA, and NSA voided it.  On June 20, 1984, he wrote to NSA on TCM letterhead asking that a new commission check be issued and sent to Camaro at a Hong Kong address.  NSA sent a check to Camaro for $12,328 on June 25, 1984, and Camaro negotiated it on July 13, 1984.

> c.   Petitioner's Representation in 1993 That He Was an Owner of Camaro

On September 16, 1983, Intergraph Corp. (Intergraph) of Huntsville bought 147,000 16K computer memory chips from Camaro for $235,200.  Petitioner endorsed the check as "owner" of Camaro.

> d.   Camaro's SCB VISA Card

On November 30, 1985, Choy and petitioner applied to SCB for a VISA card for Camaro.  A November 29, 1985, Camaro board resolution authorized petitioner to sign on behalf of Camaro with respect to the SCB VISA card.  On December 27, 1985, SCB opened a corporate VISA card account in petitioner's name.

Petitioner was the only authorized user of the SCB VISA card.  He used it in 1987 and 1988.  SCB sent the monthly statements for the SCB VISA card to petitioner at Camaro's Hong Kong address.  The amounts due were paid from Camaro's HSBC Hong Kong dollar-denominated current account.  Choy canceled petitioner's SCB VISA card on August 17, 1989.

C.   The Sale of Shinwa Radio/Cassette Players to Chrysler

   1.   Shinwa Radio/Cassette Players

NSA supplied electronic and mechanical components from 1983 to 1988 for installation on Chrysler vehicles.  One such component was a radio/cassette player (the Shinwa) manufactured by Shinwa, a Japanese company that had a factory in China.

   2.   The NSA/Camaro and Camaro/TCM Agreements

Chrysler's Acustar division, located in Huntsville, manufactured components for installation on Chrysler vehicles. NSA supplied Shinwas to the Acustar division.  TCM earned commissions in 1986 as NSA's representative for sales by NSA of small quantities of Shinwas to Chrysler.

In late 1986, Chrysler asked Shinwa to supply all of Acustar's radio/cassette players.  Shinwa agreed to supply radio/cassette players to Chrysler for 3 years beginning in 1987. Chrysler expected to buy $30 million of Shinwas annually.

A draft agreement dated January 1, 1987, relating to the sale by NSA of Shinwas to Chrysler named NSA as the principal and TCM as the representative.  Koichi Maekawa (Maekawa), president of NSA, signed the draft agreement, but petitioner did not sign it.  At petitioner's request, Camaro, not TCM, was named as the representative.  A sales representative agreement (the NSA/Camaro

agreement), dated January 1, 1987, and executed on September 1, 1987, was signed by Maekawa as president of NSA and by petitioner on behalf of Camaro.

Under the NSA/Camaro agreement, Camaro agreed to "use its best efforts and skills to sell, promote and generally create a demand for * * * [Shinwas] to * * * [Chrysler]", in exchange for which it would receive a commission of 5 percent of the net proceeds of sales of Shinwas by NSA to Chrysler.

Despite the NSA/Camaro agreement, NSA did not deal with Camaro and considered TCM to be its sales representative. Camaro did not negotiate, price, or set terms relating to the Shinwa transaction and had no role in delivering the Shinwas to Chrysler. NSA bought and took title to the radio/cassette players from Shinwa because Camaro could not take title to or provide financing for $30 million worth of Shinwa cassette mechanisms.

NSA began shipping large quantities of Shinwas to Chrysler in June 1987. On June 30, 1987, at petitioner's request, Hideo Wakashita (Wakashita), a mid-level manager of NSA, sent an internal NSA memo requesting that future commissions on the sale of Shinwas to Chrysler/Acustar be paid to Camaro and sent to petitioner at TCM in Huntsville.

Choy, on behalf of Camaro, and petitioner, as CEO/president of TCM, signed an agreement (the Camaro/TCM agreement) on August

31, 1987. The Camaro/TCM agreement provided that TCM would receive 10 to 30 percent of the commissions earned by Camaro on the sales of Shinwas to Chrysler.

Jerry Scott Taylor (Taylor) was a sales representative for TCM from 1984 to 1989. Taylor was a member of TCM's board of directors from late in 1987 to 1989. The board began meeting around 1987. Taylor attended board meetings.

Taylor began working on the Chrysler/Acustar account late in 1984 or early in 1985. He performed the day-to-day business activities relating to Chrysler's purchase of the Shinwa cassette mechanisms. Taylor used TCM's name and letterhead, not Camaro's, in dealing with NSA. Taylor first heard of Camaro in 1988, and first learned of the 1987 Camaro/TCM agreement in 1992.

On January 27, 1988, Camaro issued to Taylor a $5,000 check drawn on its U.S. dollar-denominated savings account. No company name appeared on the $5,000 check. Taylor believed this payment was an advance from petitioner of a bonus for his work for TCM.

3. Termination of the NSA/Camaro Agreement

NSA terminated the NSA/Camaro agreement on March 31, 1989. In the notice of termination, NSA stated that Camaro had let NSA erroneously assume that Camaro was an Alabama corporation when the agreement was executed. Because Camaro was a Hong Kong corporation, NSA faced unexpected liability for a large amount of withholding tax under section 881(a) (plus penalties and

interest). On April 12, 1989, NSA told Camaro that NSA would retain unpaid commissions otherwise due to Camaro to offset that potential tax liability.

D. Petitioners' Bank Accounts

Petitioner maintained a checking account at Central Bank in Huntsville in 1987 and 1988 for himself (the personal checking account). TCM maintained an operating account, a money market account, and a payroll account at Central Bank in 1987 and 1988. TCM deposited the following amounts to those accounts in 1987 and 1988:

|      |           | Account      |          |
|------|-----------|--------------|----------|
| Year | Operating | Money market | Payroll  |
| 1987 | $1,483,102 | $569,428 | $688,300 |
| 1988 | 2,153,995 | 984,528 | -- |

E. Payments to TCM Which Were Not Deposited in TCM Accounts

1. 1987

Between February 9 and September 22, 1987, on behalf of TCM, petitioner endorsed and deposited to the Double D account 17 checks payable to TCM totaling $19,738.95. Midtex Relays, Inc., issued a $2,106.63 check to TCM on July 30, 1987. Petitioner endorsed the check on behalf of TCM but did not deposit it in any account maintained by petitioner or TCM. NSA issued a $1,698.35 check to TCM, which petitioner deposited in his personal checking account on August 27, 1987.

2.  <u>1988</u>

On January 8, 1988, Montrose Products Co. issued a $3,918.80 check to TCM.  Petitioner endorsed the check on behalf of TCM but did not deposit it in an account maintained by petitioner or TCM. The check was cashed.  In February and March 1988, on behalf of TCM, petitioner endorsed and deposited in the Double D account two checks payable to TCM totaling $1,958.60.

F.  <u>Camaro Checks Reported by TCM</u>

TCM deposited two checks from Camaro totaling $11,789.54 in its operating account in October 1987.  TCM reported this amount on its 1987 return.  Between January 4 and October 25, 1988, TCM deposited checks from Camaro totaling $166,416.10 in its operating and money market accounts.  TCM reported this amount on its 1988 return.

G.  <u>Payments From NSA to Camaro in 1987 and 1988</u>

1.  <u>1987</u>

Between September 11 and November 20, 1987, NSA issued five checks totaling $298,601.27 to "Camaro Trading Co., Ltd." or "Camaro Trading Co., Ltd.  Attn:  Mr. D. Ishler".  TCM received these checks in Huntsville but did not deposit them in a TCM account.  TCM sent them to Camaro in Hong Kong.

2.  <u>1988</u>

Between January 4 and December 22, 1988, NSA issued 13 checks totaling $1,569,596.15 to "Camaro Trading Co., Ltd." or

"Camaro Trading Co., Ltd. Attn: MR. D. ISHLER". TCM received these checks in Huntsville but did not deposit them in a TCM account. TCM sent them to Camaro in Hong Kong.

### 3. Camaro's Deposit of the NSA Checks

Camaro paid Berlin Co. Exchange, Ltd., of Hong Kong a small fee to cash the NSA checks (discussed above in paragraph G). From September 1987 to January 1989, Camaro deposited $1,864,402.71 (of the $1,868,197.42 total proceeds of the NSA checks) to the HSBC U.S. dollar-denominated savings account.

## H. Camaro's Payments to or on Behalf of Petitioner

Petitioner caused Camaro to make the following transfers to him or on his behalf in 1987 and 1988.

### 1. Camaro's Payments to Marvin M. Ishler (Petitioner's Brother)

From October 29, 1987, to March 25, 1988, Camaro transferred $16,000 from its U.S. dollar-denominated savings account to Marvin M. Ishler (petitioner's brother). On March 25, 1988, Camaro transferred $5,000 to Odyssey Tours, owned by Marvin M. Ishler.

### 2. Petitioner's Payments for the Benefit of Eller

On June 1, 1988, petitioner told Choy to issue a $6,500 check to Dr. Harvey A. Weiss from Camaro's HSBC U.S. dollar-denominated savings account. A $6,500 check dated June 1, 1988,

was issued to Dr. Weiss and deposited in his account on June 23, 1988. These funds were used to pay for plastic surgery for Eller. Also on June 1, 1988, Camaro transferred $2,000 from its U.S. dollar-denominated savings account to Eller.

### 3. Payments to or for the Benefit of Petitioner's Daughter

On March 25, 1988, Camaro transferred $5,000 from its U.S. dollar-denominated savings account to petitioner's daughter. On June 7, 1988, petitioner told the Hong Kong office of HSBC to wire $27,820 to a BMW dealer to pay for a 1987 BMW for petitioner's daughter. On June 18, 1988, the car dealer issued a $1,000 check (refunding the deposit paid for the BMW) payable to the Bank of San Clemente. This check was used to buy a $1,000 Bank of San Clemente cashier's check, payable to petitioner. On June 23, 1988, petitioner deposited the check in his personal checking account.

### 4. Petitioner's Deposit of Camaro Funds in His Personal Checking Account

On August 23, 1988, petitioner told Choy to issue a $5,000 check payable to Sinja Kim, a friend of petitioner, from Camaro's HSBC U.S. dollar-denominated savings account. HSBC issued a $5,000 check dated August 23, 1988, to Sinja Kim. Sinja Kim and Sharon Woodard, an employee of TCM, endorsed the check. Sharon Woodard deposited it in petitioner's personal checking account on October 6, 1988.

5. <u>Transfer of $35,000 From Camaro Via Petitioner's Mother to TCM's Operating Account</u>

On September 22, 1988, Camaro directed HSBC to issue four checks totaling $35,000 to Lela Ishler from Camaro's HSBC U.S. dollar-denominated savings account. HSBC issued the checks on September 22, 1988. On October 10, 1988, Lela Ishler opened a money market account at Bank of the South, Dothan, Alabama. She deposited $17,000 in that account in October 1988. She also deposited $17,700 in her account at SouthTrust Bank of Dothan, Alabama, and received $300 in cash in October and November 1988.

Marvin M. Ishler had signature authority for Lela Ishler's money market account. On November 21, 1988, Bank of the South issued a $26,000 cashier's check to Marvin M. Ishler from funds in Lela Ishler's money market account. Marvin M. Ishler and petitioner endorsed the check, and petitioner deposited it in the TCM operating account on November 22, 1988.[5]

Marvin M. Ishler also had signature authority for Lela Ishler's SouthTrust account. On November 21, 1988, Marvin M. Ishler wrote a $9,000 check payable to cash on the SouthTrust account. He used those funds to buy a $9,000 SouthTrust official check payable to petitioner, which petitioner endorsed and deposited in the TCM operating account on November 22, 1988.

---

[5] Although TCM's 1988 year is not before the Court and neither party focuses on TCM's receipt of this $35,000, we note that the parties stipulated that TCM reported all business receipts deposited to its accounts in 1988.

6.   Camaro's Transfer of $5,000 to Hudson (Petitioner's Niece)

On December 5, 1988, petitioner told Choy to have HSBC issue a $5,000 check to petitioner's niece, Hudson, from Camaro's HSBC U.S. dollar-denominated savings account.  On December 19, 1988, Hudson deposited the HSBC check in her credit union account.

Hudson died in July 1994.  By letter dated August 30, 1994, petitioner stated that he had lent her $5,000 and demanded that Hudson's estate repay that amount.

7.   Transfer of $10,000 From Camaro to Sylvia Mangin

On May 26, 1988, pursuant to petitioner's instruction to Choy, Camaro transferred $10,000 from its U.S. dollar-denominated savings account to Sylvia Mangin to pay the expenses of a ski trip taken by the Mangins and petitioner's family.

I.   Petitioners' Tax Returns

1.   Petitioners' Tax Return Preparer

Sidney R. White (White), C.P.A., prepared TCM's and petitioner's tax returns for 1987 and 1988 and petitioner's amended tax returns for 1987 and 1988.  Petitioner gave White the information he used to prepare those returns.  Petitioner did not give White records of any of the Camaro accounts.  Petitioner did not tell White that TCM had sent NSA checks to Hong Kong or that petitioner had signature authority over any Camaro accounts.

2.   Petitioner's 1987 and 1988 Returns

Petitioner did not report income from the 1987 and 1988 NSA checks issued to Camaro on his 1987 and 1988 returns or 1987 and 1988 amended returns.

Petitioner filed his 1987 return on October 19, 1988, and his amended 1987 return on May 15, 1989.  Petitioner filed his 1988 return on September 28, 1989, and respondent received his amended 1988 return on January 22, 1990.

3.   TCM's 1987 and 1988 Returns

TCM did not report income from the 1987 and 1988 NSA checks issued to Camaro on its 1987 and 1988 tax returns.  TCM overstated its deductions by $6,359 on its 1988 return. Petitioner signed and filed all of TCM's tax returns.

J.   Petitioners' Indictments and Guilty Pleas

In March 1997, petitioner, TCM, and Camaro were indicted by a grand jury on several counts.  Petitioner pled guilty to making a false statement on a 1992 loan application, and TCM pled guilty under section 7206(1) to filing a false amended income tax return for 1988.

K.   Statute of Limitations and Petition To Quash Summons

1.   Proceedings in the U.S. District Court for the Northern District of Alabama

On October 4, 1990, respondent served nine third-party administrative summonses relating to petitioners' and Camaro's tax liabilities for the 1983 through 1989 tax years.  Petitioners

and Camaro filed a petition to quash the nine summonses (the Alabama petition to quash) in the U.S. District Court for the Northern District of Alabama (the Alabama District Court) on October 10, 1990.

Respondent served four more third-party administrative summonses relating to petitioners' and Camaro's tax liabilities for the 1983-89 tax years in October 1990. Around October 29, 1990, petitioners and Camaro amended the Alabama petition to quash to include the four additional third-party summonses.

On April 29, 1991, the Alabama District Court denied the Alabama petition to quash as to 12 of the 13 summonses. On June 10, 1991, the Alabama District Court granted the petition with respect to one of the summonses.

2. Proceedings in the U.S. District Court for the Southern District of New York

On October 11, 1990, respondent served a third-party recordkeeper summons on SCB, directing the production of certain documents relating to petitioners' and Camaro's tax liabilities for the 1983-89 tax years. On October 12, 1990, respondent served summonses on the Hongkong Bank (the HKB summons) and on HSBC (the HSBC summons) relating to petitioners' and Camaro's tax liabilities for the 1983 through 1989 tax years.

On November 2, 1990, SCB's attorneys responded to the SCB summons but did not produce the records identified in the summons.

On August 29 and 30, 1991, the United States moved to enforce the HSBC and the SCB summonses in the U.S. District Court for the Southern District of New York (the New York District Court). On March 24, 1992, the New York District Court filed a stipulation and order in which it stated that it would request judicial assistance from the Supreme Court of Hong Kong to obtain the discovery sought by the SCB and HSBC summonses, and the parties agreed to a stay of the summons enforcement proceedings to permit the United States to seek judicial assistance from the Supreme Court of Hong Kong. The order stayed the enforcement of the SCB and HSBC summonses pending resolution of the judicial assistance request.

The Alabama District Court executed a request for judicial assistance of the Supreme Court of Hong Kong on July 23, 1993. The Supreme Court of Hong Kong granted the Alabama District Court's request for judicial assistance on March 25, 1994. From November 1994 to August 1997, the Alabama District Court made supplemental requests for judicial assistance from the Supreme Court of Hong Kong seeking documents which had been requested in the SCB and HSBC summonses but not produced in response to the granting by the Supreme Court of Hong Kong in March 1994 of the request for judicial assistance.

On December 8 and 16, 1998, the New York District Court entered stipulations in which the United States withdrew its motions to enforce the HSBC and SCB summonses, respectively.

L.    The Notices of Deficiency

Respondent began the audit of these cases before October 1990 and issued notices of deficiency to petitioner and TCM on May 12, 1999.

OPINION

A.    Unreported Income

1.    Contentions of the Parties

Respondent contends that petitioner had unreported income of $308,723.36[6] in 1987 and $1,421,217.97[7] in 1988, and that TCM had unreported income of $307,695.61[8] in 1987.[9]   Respondent contends that TCM was taxable on the commissions NSA paid to Camaro in 1987 and on the 1987 checks payable to TCM but deposited in petitioner's personal checking account or the Double D account or cashed without being deposited.   Respondent also contends that

---

[6]   Respondent determined that petitioner had unreported income of $310,314.00 for 1987 but now contends that petitioner had unreported income of $308,723.36.

[7]   Respondent determined that petitioner had unreported income of $1,404,026 for 1988 but now contends that petitioner had unreported income of $1,421,217.97.   Respondent bears the burden of proving the increased deficiency.   Rule 142(a)(1).

[8]   Respondent determined that TCM had unreported gross receipts of $309,286 for 1987 but now contends that TCM had unreported gross receipts of $307,695.61.

[9]   Respondent contends that TCM had unreported income of $307,696 and petitioner had unreported income of $308,723 for 1987.   The difference ($1,027) in those amounts is attributable to adjustments made by respondent affecting only the return of either petitioner or TCM.

TCM's unreported income for 1987 described above is taxable as a constructive dividend to petitioner, and that petitioner is liable for tax on his distributive share of TCM's income for 1988 from checks (a) payable to TCM but deposited in petitioner's personal checking account, the Double D account, or cashed without being deposited, and (b) payable to Camaro instead of TCM.

Petitioners contend that Camaro earned the money it received from NSA.

2.    <u>Whether Camaro Earned the Money It Received</u>

Petitioners contend that Camaro was essential to NSA because Camaro could take title to the Shinwas and resell them to NSA and Chrysler.  Petitioners also contend that Camaro could provide essential services such as financing to meet Chrysler's needs as its needs for Shinwas grew.  We disagree; Camaro could not and did not take title to or provide financing for $30 million worth of Shinwas annually.

Petitioners contend Camaro was essential to the Shinwa transaction because it had an export license which was needed to ship the Shinwas to Chrysler in the United States.  However, there is no evidence that Camaro had an export license or that Camaro shipped the Shinwas.

Petitioner did not tell Taylor about the NSA/Camaro contract.  Taylor was the TCM employee who handled Chrysler's

purchase of Shinwas, and he had been a member of TCM's board of directors since 1987. Taylor said that he knew of no legitimate business purpose for the TCM/Camaro relationship. To the best of Taylor's knowledge, petitioner never reported the existence of the NSA/Camaro agreement to TCM's board. TCM's board did not ratify or approve the NSA/Camaro agreement.

Wakashita, a mid-level manager of NSA, considered TCM to be its sales representative on the Shinwa transaction from 1987 to 1989. He regularly dealt with Taylor and knew of no business activity by Camaro relating to the Shinwa transaction. Kerry L. Langdon, Chrysler's Huntsville purchasing agent, was not aware of anything that Camaro contributed to the Chrysler/NSA/TCM relationship. Camaro did not negotiate, price, or set terms relating to the Shinwa transaction and had no role in delivering the Shinwas to Chrysler.

Petitioners contend that we should view Wakashita's testimony as biased because Camaro had failed to inform NSA that Camaro was a foreign corporation, payments to which by NSA may have been subject to withholding tax under section 881(a). We disagree, and we note that the testimony of Kerry Langdon and Taylor corroborated Wakashita's testimony.

Petitioner testified that he needed to keep Camaro as a party to the agreement to protect his business reputation and because Camaro might be a lucrative source of future business in

China for TCM. We disagree. There is no credible evidence to support those claims. We conclude that Camaro performed no bona fide services for the Shinwa-Chrysler transaction.

### 3. Conclusion

Income is taxed to the party which earns it; the incidence of taxation cannot be shifted by an anticipatory arrangement. Helvering v. Horst, 311 U.S. 112, 119-120 (1940); Lucas v. Earl, 281 U.S. 111, 114-115 (1930); Kimbrell v. Commissioner, 371 F.2d 897, 901-902 (5th Cir. 1967), affg. T.C. Memo. 1965-115. We do not recognize petitioner's diversion of TCM's commission income to Camaro for Federal income tax purposes. We conclude that TCM understated its taxable income in 1987 by failing to report: (1) $298,601.27 from NSA checks payable to Camaro; (2) $19,738.65 that TCM received but diverted to petitioner's Double D account; (3) $2,106.63 that TCM received but did not deposit to a TCM account; and (4) $1,698.35 that TCM received but that was diverted to petitioner's personal account.[10]

Where a shareholder diverts corporate funds to his or her own use, those funds generally are constructive dividends to the shareholder and are ordinary income to the extent of the corporation's earnings and profits. Secs. 301, 316; Truesdell v.

---

[10] TCM had unreported income of $322,144.90, minus the amount of Camaro checks TCM deposited and reported ($11,789.54) and the amount by which TCM overstated its gross business receipts for 1987 ($2,660).

Commissioner, 89 T.C. 1280, 1295 (1987); Falsetti v.
Commissioner, 85 T.C. 332, 356-357 (1985); Henry Schwartz Corp.
v. Commissioner, 60 T.C. 728, 744 (1973).  Petitioner does not
contend that TCM's earnings and profits were less than the amount
of constructive dividends respondent determined.  We conclude
that all of TCM's unreported income was constructive dividend
income to petitioner because he caused NSA to divert TCM's income
to Camaro and he used some of the diverted funds for his own
benefit.  We do not limit our holding to the amount respondent
can prove was spent for petitioner's personal benefit because
respondent's determination is presumed to be correct for 1987,
see Levitt v. Commissioner, T.C. Memo. 1995-464, affd. without
published opinion 101 F.3d 691 (3d Cir. 1996), and respondent
presented sufficient evidence to carry the burden of proving the
increased deficiency for 1988.

TCM was an S corporation in 1988, and so it is not taxable
on any unreported income it had for that year; that income passes
through to petitioner.  Sec. 1366.

We conclude that petitioner understated his taxable income
by failing to report constructive dividends from TCM of
$308,723.36 in 1987 and his 100-percent distributive share of
TCM's unreported income of $1,421,217.97 in 1988.

B.   Additions to Tax for Fraud Under Section 6653(b)

1.   Background

Respondent contends that petitioner is liable for the addition to tax for fraud under section 6653(b) for 1987 and 1988 and that TCM is liable for the addition to tax for fraud under section 6653(b) for 1987.  Respondent has the burden of proving fraud by clear and convincing evidence.  See sec. 7454(a); Rule 142(b).  Respondent must establish:  (a) Each petitioner underpaid tax for each year in issue, and (b) some part of the underpayment is due to fraud.  See sec. 6653(b); Parks v. Commissioner, 94 T.C. 654, 660-661 (1990); Petzoldt v. Commissioner, 92 T.C. 661, 699 (1989).

2.   Underpayment

Respondent has shown that TCM underpaid tax for 1987 by failing to report:  (1) $298,601.27 from NSA checks payable to Camaro; (2) $19,738.65 from 17 checks from various sources that TCM diverted to the Double D account; and (3) $3,804.98 from Midtex Relays and NSA checks deposited to petitioner's personal account or cashed by petitioner.  Respondent has also shown that petitioner underpaid tax by failing to report constructive dividend income from TCM of $308,723.36 in 1987 and his distributive share of TCM income of $1,421,217.97 in 1988.  Therefore, respondent meets this requirement.

3.   Fraudulent Intent

For purposes of section 6653(b), fraud is the intentional commission of an act to evade a tax believed to be owing.  Webb v. Commissioner, 394 F.2d 366, 377 (5th Cir. 1968), affg. T.C. Memo. 1966-81.  Fraud is never presumed; it must be established by affirmative evidence.  Beaver v. Commissioner, 55 T.C. 85, 92 (1970).

To establish that petitioner is liable for the fraud penalty for 1987 and 1988, respondent must show by clear and convincing evidence that petitioner knew he was taxable in each of those years on at least some of the funds that he caused NSA to divert from TCM to Camaro and some of the funds he diverted from TCM to Double D or to his personal account.  To establish that TCM is liable for the fraud penalty for 1987, respondent must show by clear and convincing evidence that petitioner, as president and CEO of TCM, also knew TCM was liable for tax on at least some of the funds he caused NSA to divert from TCM to Camaro and some of the funds he diverted from TCM to Double D or to his personal account.

The Commissioner may prove fraud by circumstantial evidence because direct evidence of the taxpayer's intent is rarely available.  Stephenson v. Commissioner, 79 T.C. 995, 1005-1006 (1982), affd. 748 F.2d 331 (6th Cir. 1984).

4.  <u>Badges of Fraud</u>

    a.  <u>Fraud as to Petitioner</u>

Courts have developed several objective indicators, or "badges", of fraud.  <u>Recklitis v. Commissioner</u>, 91 T.C. 874, 910 (1988).  Several indicia that petitioner knew that he was taxable on at least some of the funds he diverted from TCM are present in this case.

Concealing income from one's return preparer can be evidence of fraud.  <u>Korecky v. Commissioner</u>, 781 F.2d 1566, 1569 (11th Cir. 1986), affg. T.C. Memo. 1985-63; <u>Farber v. Commissioner</u>, 43 T.C. 407, 420 (1965), modified 44 T.C. 408 (1965).  Petitioner did not give White records of any Camaro accounts or tell White that he used Camaro funds for personal purposes or that he had Camaro make payments to his family and friends.  Petitioner did not tell White that he received the NSA checks in Huntsville and sent them to Hong Kong.

Petitioners contend that petitioner did not have signature authority over Camaro's bank accounts in 1987 and 1988 because Camaro's board of directors revoked petitioner's signature authority over Camaro's SCB accounts by resolution dated December 13, 1983.

Respondent contends that SCB did not receive Camaro's revocation of petitioner's signature authority.  Petitioners maintain that respondent has not proven that SCB did not receive

the revocation resolution because respondent did not show that respondent had possession of all of SCB's documents relating to Camaro's accounts.  We disagree.  A letter from the legal department of SCB dated September 29, 1997, states that the bank does not have a copy of Camaro's December 13, 1983, resolution.

Petitioners point out that petitioner did not write checks on Camaro's SCB accounts while he had signature authority over those accounts.  That fact is not significant because petitioner could and did direct Choy to make transfers from the Camaro accounts to him or on his behalf.

A taxpayer's use of a complex scheme to divert income from his corporation to third parties he controls may be evidence of the taxpayer's attempt to conceal income.  Bradford v. Commissioner, 796 F.2d 303, 307-308 (9th Cir. 1986), affg. T.C. Memo. 1984-601.  Petitioner arranged for payments from NSA to bypass TCM and instead to be paid to Camaro and for payments from various sources, including Midtex Relays, to bypass TCM and be paid to Double D or petitioner.

A taxpayer's diversion of corporate funds for his or her personal use is evidence that the taxpayer committed fraud.  Solomon v. Commissioner, 732 F.2d 1459, 1460-1461 (6th Cir. 1984), affg. T.C. Memo. 1982-603; United States v. Brill, 270 F.2d 525, 527 (3d Cir. 1959).  Petitioner used Camaro to divert NSA payments to himself and to his family and friends through an

opaque series of transfers in 1987 and 1988.  Petitioner knew about but did not report the diverted payments.  This badge of fraud applies to petitioner for 1987 and 1988 because he knowingly diverted NSA's payments for his personal use in both years.

Petitioners contend that the fact that respondent took 8 to 10 years to determine the taxation of the unreported income in dispute here shows that respondent had doubts about this case and so has not proven by clear and convincing evidence that petitioner and TCM are liable for fraud for the years in issue. We disagree.  Petitioner should not benefit from the fact that it took respondent a long time to penetrate the maze petitioner chose to create.

Respondent has clearly and convincingly proven that petitioner had the requisite fraudulent intent, and that all of petitioner's underpayments are due to fraud.[11]  Thus, petitioner is liable for the addition to tax for fraud under section 6653(b) for 1987 and 1988.

b.  Fraud as to TCM

We have found that petitioner is liable for the fraud penalty for 1987 and 1988.  See paragraph B-4-a, above.

---

[11]  Even if we found that respondent established by clear and convincing evidence that petitioner is liable for fraud only on the payments he diverted from TCM to Double D or his own checking account, the burden would then shift to petitioner to show how much of the underpayment is not due to fraud.  Sec. 6653(b)(2).  Petitioner has not shown that any of the underpayments for 1987 and 1988 was not due to fraud.

Respondent also contends that TCM is liable for fraud for failure to report substantially the same amounts for 1987 that petitioner prevented TCM from receiving. Specifically, respondent contends that TCM is liable for fraud for 1987 because petitioner concealed from TCM's tax preparer information about the NSA, Midtex Relays, and other checks diverted from TCM's account, petitioner signed TCM's 1987 return even though he knew it was inaccurate and omitted substantial income, TCM pled guilty under section 7206(1) to knowingly making false statements on its amended 1988 return, and petitioner used a complex series of transactions to divert payments from NSA to himself and Camaro.

Fraud is never presumed or imputed; it must be established by independent evidence of fraudulent intent. <u>Toussaint v. Commissioner</u>, 743 F.2d 309, 312 (5th Cir. 1984), affg. T.C. Memo. 1984-25; <u>Petzoldt v. Commissioner</u>, 92 T.C. 661, 700 (1989); <u>Beaver v. Commissioner</u>, 55 T.C. 85, 92 (1970). We may not impute from our finding that petitioner is liable for fraud that TCM is also liable for fraud. To establish that TCM is liable for the fraud penalty for 1987, respondent must show by clear and convincing evidence that, as president and CEO of TCM, petitioner, in addition to having knowledge of his own obligation to report the income he prevented TCM from receiving, knew that TCM was liable for tax on at least some of the funds he caused

NSA to divert from TCM to Camaro in 1987. We conclude that respondent has not clearly and convincingly made that showing.

Petitioner concealed the NSA payments to Camaro from TCM's employees. Respondent has not proven by clear and convincing evidence that petitioner knew TCM was taxable on funds he arranged for NSA to pay to Camaro, checks from various sources that TCM diverted to the Double D account, and checks from Midtex Relays and NSA deposited to petitioner's personal account or cashed by petitioner. We are convinced that petitioner knew he was taxable on those funds but not that he knew that both TCM and he were taxable on the same funds.

TCM's conviction under section 7206(1) for filing a false return for 1988 does not show that TCM committed fraud in 1987. We do not consider TCM's conviction under section 7206(1) in 1988, on different facts, as evidence of fraud in 1987. Klein v. Commissioner, T.C. Memo. 1984-392, affd. 880 F.2d 260 (10th Cir. 1989); Corson v. Commissioner, T.C. Memo. 1965-214, affd. 369 F.2d 367 (3d Cir. 1966).

We conclude that respondent has not shown by clear and convincing evidence that TCM fraudulently intended to underpay tax for 1987.

C. Statute of Limitations

The statute of limitations does not bar respondent from assessing and collecting tax from petitioner for 1987 and 1988

because we have found that petitioner committed fraud for those years. Sec. 6501(c)(1).

TCM timely filed its 1987 Federal income tax return on March 15, 1988. The 3-year limitation on the time to assess tax for TCM's 1987 Federal income taxes normally would have expired on March 15, 1991. Petitioners argue that the 3-year limitation bars assessment of tax for TCM for 1987. Respondent argues that it does not because the time to assess tax was tolled during the pendency of the summons enforcement proceedings. Sec. 7609(e).

If an administrative summons served on a "third-party recordkeeper" requires the production of records on the affairs of another person, sec. 7609(a), that person may stay compliance with the summons by giving notice in writing to the person summoned not to comply with the summons, sec. 7609(b). SCB extended credit to petitioner through the SCB VISA card in 1987 and 1988 and, thus, was a third-party recordkeeper. Sec. 7609(a)(3)(C).

When a taxpayer commences a proceeding to quash a summons in which he or she is identified, the period of limitations is suspended during the period that the proceeding and appeals with respect to the enforcement of the summons are pending. Sec. 7609(e)(1).[12]

---

[12] Sec. 7609(e) provides in pertinent part as follows:

SEC. 7609(e). Suspension of Statute of Limitations.--
(continued...)

If a third party contests a summons and the summons dispute is not resolved within 6 months, the period of limitations is suspended from the date which is 6 months after the service of the summons until the final resolution of the matter.  Sec. 7609(e)(2).

1.    Suspension of the Limitation on the Time To Assess Tax by Section 7609(e)(1)

On October 4, 1990, respondent issued nine third-party administrative summonses concerning TCM's income tax liability for 1987.  TCM filed the Alabama petition to quash on October 10,

_____

[12](...continued)
(1) Subsection (b) action.--If any person takes any action as provided in subsection (b) and such person is the person with respect to whose liability the summons is issued (or is the agent, nominee, or other person acting under the direction or control of such person), then the running of any period of limitations under section 6501 (relating to the assessment and collection of tax) or under section 6531 (relating to criminal prosecutions) with respect to such person shall be suspended for the period during which a proceeding, and appeals therein, with respect to the enforcement of such summons is pending.

(2) Suspension after 6 months of service of summons.--In the absence of the resolution of the summoned party's response to the summons, the running of any period of limitations under section 6501 or under section 6531 with respect to any person with respect to whose liability the summons is issued (other than a person taking action as provided in subsection (b)) shall be suspended for the period--

(A) beginning on the date which is 6 months after the service of such summons, and

(B) ending with the final resolution of such response.

1990, 156 days before the date which is 3 years after TCM filed its 1987 return. Thus, 156 days remained at that time before the expiration of the 3-year period of limitations with respect to TCM's 1987 taxable year.

On June 10, 1991, after it had denied the Alabama petition to quash as to all but one of the summonses, the Alabama District Court granted the petition with respect to that summons. Under 28 U.S.C. section 2107(b) and rule 4(a)(1)(B) of the Federal Rules of Appellate Procedure, the 60-day period for appeal of the Alabama District Court's June 10, 1991, order expired August 9, 1991. Thus, the running of the period of limitations remained suspended by section 7609(e)(1) until August 9, 1991. Hefti v. Commissioner, 97 T.C. 180, 199-200 (1991), affd. 983 F.2d 868 (8th Cir. 1993); sec. 301.7609-5(b), Proced. & Admin. Regs.

2. Continuation of the Suspension of the Limitation on Time To Assess Tax by Section 7609(e)(2)

On October 11, 1990, respondent issued a third-party administrative summons to SCB concerning TCM's 1987 income tax liability. On November 2, 1990, SCB's attorneys responded to, but did not produce the documents identified in, the SCB summons. The 3-year statute was thus tolled by section 7609(e)(2) on April 11, 1991, the date which is 6 months after respondent served the SCB summons.

On March 24, 1992, the New York District Court stayed the enforcement of the SCB summons pursuant to joint stipulation between the United States and SCB (and HSBC).

On December 16, 1998, the United States withdrew its motions to enforce the SCB and HSBC summonses.

3.   Petitioners' Contentions

Petitioners contend that section 7609(e) does not suspend the period of limitations here because of defects in the SCB summons.  We disagree.  A District Court has jurisdiction to decide the merits of a petition to quash summons.  Sec. 7609(h)(1).  Petitioners may not collaterally attack the New York District Court's proceeding in this Court.  See Shaheen v. Commissioner, 62 T.C. 359, 364-365 (1974); Roberson v. Commissioner, 41 T.C. 577, 581 (1964).

Petitioners also contend that, because the parties agreed that applying for letters rogatory was the proper procedure for seeking information and documents from SCB and HSBC, the stipulation agreed to on March 24, 1992, was the final resolution of the SCB and HSBC summons dispute and ended the tolling of the period of limitations.  We disagree that the stipulation ended the SCB summons dispute for purposes of section 7609(e)(2)(B). The enforcement of the SCB and HSBC summonses remained pending in the New York District Court until December 16, 1998, when that court entered a stipulation in which the United States withdrew its motion to enforce the SCB summons.

The deficiency notice was mailed to TCM on May 12, 1999, which is 147 days after the date of the final resolution of SCB's

response to the SCB summons (December 16, 1998).  That is less than the 156 days remaining in the 3-year period of limitations. Thus, the notice of deficiency of May 12, 1999, was timely mailed.

D.   Substantial Understatement Under Section 6661

Respondent determined that petitioner is liable for the addition to tax under section 6661 for substantial understatement of income tax for 1987 and 1988 and that TCM is liable for the addition to tax under section 6661 for 1987.  Petitioner bears the burden of proving that respondent erred in imposing the addition to tax under section 6661.  Rule 142(a)(1).

Petitioners contend that they did not substantially understate their income tax for 1987 and 1988.  Petitioners raise no other defense.  We conclude that petitioners are liable for the section 6661(a) addition to tax.

To reflect the foregoing,

Decisions will be entered

under Rule 155.